Gustave GERSTLE et al., Plaintiffs-Appellees (Cross-Appellants),

v.

GAMBLE–SKOGMO, INC., Defendant-Appellant (Cross-Appellee).

Nos. 604, 605, Dockets 72–2259, 72–2345.

United States Court of Appeals, Second Circuit.

Argued Feb. 16, 1973.

Decided May 9, 1973.

Emanuel Becker, Becker Schreiber & Gordon, New York City, for plaintiffs-appellees (cross-appellants).

John F. Arning, New York City (Charles W. Sullivan, and Sullivan & Cromwell, New York City, of counsel), for defendant-appellant (cross-appellee).

Before FRIENDLY, Chief Judge, OAKES, Circuit Judge, and DAVIS,* Judge.

FRIENDLY, Chief Judge:

This appeal and cross-appeal in a class action by minority stockholders of General Outdoor Advertising Co. (GOA), attacking its merger into defendant Gamble-Skogmo, Inc. (Skogmo), raise a variety of new and difficult questions with respect to the SEC's Proxy Rules, adopted under § 14(a) of the Securities Exchange Act, and the remedy for their violation. Three comprehensive opinions

---

* Of the United States Court of Claims, sitting by designation.

by Judge Bartels, 298 F.Supp. 66 (E.D. N.Y.1969), 332 F.Supp. 644 (E.D.N.Y. 1971), and 348 F.Supp. 979 (E.D.N.Y. 1972), along with two elaborate reports by the special master, Arthur H. Schwartz, Esq., on the amount of damages, attest to the problems which the recognition of a private right of action for violation of § 14(a) in J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), have thrust upon the federal courts, and also the assiduity with which the judge and the special master tackled them.

## I. *The Facts*

The facts are stated in such detail in Judge Bartels' first opinion, 298 F.Supp. at 74–89, that we can limit ourselves to those that are vital for understanding the issues on appeal. In order to make the following summary more enlightening, it will be well to state at the outset that the gravamen of plaintiffs' complaint concerning the Proxy Statement sent to GOA's stockholders was that its disclosure that Skogmo expected to realize large profits from the disposition of such of GOA's advertising plants as had not been sold at the date of the merger was inadequate.

GOA had been the largest company in the outdoor advertising business in the United States. It had also acquired over 96% of the stock of Claude Neon Advertising, Limited, the largest outdoor advertising company in Canada, and all the stock of Vendor, S.A., the largest such company in Mexico. Skogmo was a company engaged in wholesale and retail merchandising of durable and soft goods through subsidiaries, franchised dealers, and discount centers in the United States and Canada, and related activities.

Between April, 1961 and March, 1962, Skogmo acquired 50.12% of GOA's common stock. Bertin C. Gamble, chairman of the board of directors and controlling stockholder of Skogmo, was elected to GOA's board in October, 1961. He was followed by Roy N. Gesme, a former consultant to Skogmo, who was to act as liaison between the two companies. Two Skogmo vice presidents were added to the GOA board in April, 1962. In the same month Gamble engaged Donald E. Ryan, who had no previous experience in the outdoor advertising business, as an officer of GOA, primarily in charge of the sale of plants, and had him elected as a member of the board and executive vice president of GOA; the district court found, 298 F.Supp. at 75, that "Ryan was indisputably Skogmo's man at General and was expected to evaluate General's prospects and make recommendations to Skogmo for the future." There were seven other directors. Four, including Burr L. Robbins, the president of GOA, had been associated with GOA before Skogmo's acquisition of control; three were outsiders. Despite the fact that only five of the twelve directors were Skogmo men, Skogmo does not dispute that it had effective control of GOA.

Beginning in 1961 the outdoor advertising business began to encounter serious difficulties. Disappointing reports, indicating that income from advertising plants had fallen off substantially during 1961 and that the expected rate of return in the business was declining, were made to Gesme by the management in the early months of 1962. Upon assuming his duties in May 1962, Ryan, after an intensive study, reported to Gamble that GOA's advertising plants could not be operated profitably and should be sold. A strong impulse in that direction had been furnished by the sale, in January 1962, of GOA's St. Louis plant to a competitor at a price described as "fantastic".[1] After this sale, Gesme had prepared a detailed report on the property and earnings of each of GOA's plants, referred to as the "Green Book", which listed sales prices for the plants, apparently calculated on

---

[1]. The price was $2,953,000, of which $653,000 was in cash and the balance in notes, as against a book value of $879,000.

the basis of the St. Louis sale, that were generally well in excess of their book values.

In July 1962, Gamble publicly announced GOA's intention to sell its "less profitable" and "competing plants," and expounded at a meeting of GOA executives his policy of "corporate mobility" and diversification, to be accomplished by selling the less profitable plants and investing the proceeds in new projects. Robbins had at this time prepared a list of what he considered GOA's most profitable plants, and urged that they be retained to form the nucleus of a profitable outdoor advertising operation. Nevertheless, Ryan continued to solicit offers for the sales of all the plants. He made available to prospective purchasers five-year operating statements, supplemented, in September 1962, by eight-year earnings projections for each plant. These indicated that, if 29% of the asking price were paid in cash, the balance could be paid out of eight-year earnings.[2] Through October 1, 1962, GOA had sold 13 of its 36 plants, including two of those on Robbins' list, and had almost fully negotiated several more sales. All this represented somewhat of a victory for Ryan over Robbins.

The sales program was temporarily interrupted in October 1962, when counsel raised a question whether the receipt of the large volume of purchasers' notes and a substantial investment by GOA in the stock of Allegheny Corporation might not have caused GOA to become an investment company within the purview of the Investment Company Act of 1940. Gamble took two important steps designed to avoid this result. First, he and Walter Davies, Skogmo's treasurer, negotiated an agreement with The First National Bank of Chicago and three other banks for the sale of $14,000,000 of the 6% purchasers' notes then held by GOA, at their face value, with the banks to collect the interest, retain 5%, and hold the additional 1% in escrow to be

paid to GOA upon full payment of the notes. With the proceeds of the sales of the plants and notes, Gamble then caused GOA to invest $22,459,391 in the purchase of approximately 98% of the stock of Stedman Brothers, Limited, a Canadian corporation operating a chain of small wares stores.

Accordingly, in the latter part of December, Ryan and others announced that plant sales were being resumed and that all plants save that at Minneapolis were available for sale. Many more plants were sold in that month. The result was that by the end of 1962, GOA had sold 23 of its 36 plants, including 7 of the 11 listed by Robbins as the top earners, for a total price of $29,832,260, of which $5,247,506 was in cash and $24,584,754 was in notes. At the same time, preparations were made for future sales. Toward the end of December 1962, the agreement with the banks was revised so that the syndicate would buy up to $55,000,000 of purchasers' notes— a sum sufficient to take care of the sale of all GOA's remaining plants. A memorandum showing an up-to-date valuation of the remaining plants was prepared in late November by William H. Dolan, GOA's controller, on the basis of the prior sales and offers made by Curtis L. Carlson for eleven plants sold in December.

In December, 1962, the SEC instituted an investigation to determine whether Skogmo was an investment company. General's officers were subpoenaed, and extensive hearings were held in January. Apparently this led to a slowing up of the sales program. The sale of the Kansas City plant, which had been fully negotiated in October 1962, was closed in January 1963, but in the same month Ryan wrote prospective purchasers that all sales were being suspended. This did not mean, however, that GOA had altered its objective. On March 5, 1963, Allan Kander, a business broker, made an offer of $4,000,000 for the Philadel-

---

2. This was due in large part to the stepped-up basis for depreciation available to a purchaser, and the consequent favorable cash flow.

phia and Harrisburg plants on behalf of Wayne Rollins, president of Rollins Broadcasting Company, and advised Ryan that Rollins had authorized him to negotiate, on an all-cash basis, for all the unsold GOA plants except those in the greater New York City area. Ryan rejected the $4,000,000 bid as too low, but indicated a desire for a further meeting after March 21, which was never held. In March, also, Gesme prepared and submitted to Skogmo a report showing the "Green Book Value," "Probable Sales Value," "Cost on General's Books," and "Net Profit after Tax" for each of the unsold plants; the total "Net Profit after Tax" after projected sales of all plants was $19,925,000. Offers were received for small plants at Hartford, Connecticut, and Binghamton, New York, but were not accepted. During this period, John W. Kluge, president of Metromedia, Inc., continually made known to Ryan his company's interest in acquiring the large Chicago plant.

On April 11, 1963, GOA's Board of Directors adopted a resolution included in its quarterly report to stockholders, that for the present "GOA will continue to operate the plants operated by it excepting Oklahoma City where negotiations for sale are now pending." On May 31, 1963, the Oklahoma City plant was sold for $1,000,000, the price that had been offered before the temporary suspension of sales in October 1962. No other plant sales were made until late in 1963, after the merger.

In February and March, 1963, Skogmo began discussing with A. G. Becker & Co., an investment banking firm, the desirability of some form of consolidation of GOA and Skogmo. A prime motivating factor was the desirability of placing the management of GOA's newly acquired Stedman Canadian retail stores, a type of business with which GOA's officers had had no experience, under the direct control of Skogmo, which, in addition to its own operation, controlled McLeod's Limited, a retail chain special-izing in the sale of hard goods in Canada. A preliminary Becker memorandum, dated March 11, 1963, mentioned as one attraction for Skogmo in a proposed offer to GOA stockholders on a share for share basis—a slight premium over the then market price of GOA shares—that Skogmo would pick up approximately $37 per share in book value, [3] "such book value being approximately $13 under estimated final liquidation value per share . . . providing steps with respect to the liquidation of GOA prove out as expected." The report also noted that a factor which a GOA stockholder might consider in evaluating such an offer was a "question-mark about 1963 activities of the Company; possible further enhancement of value of GOA shares through more sales of plants."

Instead of offering GOA stockholders a share-for-share exchange or, as Becker had recommended, one share of a new Skogmo $20 5% preferred convertible into a half share of Skogmo common plus a half share of the latter for each share of GOA common stock, Skogmo decided in May 1963 that the transaction should take the form of a statutory merger in which GOA stockholders would receive for each share of GOA stock a share of $40 par value preferred Skogmo stock paying dividends of $1.75 per annum and convertible into common on a share-for-share basis. Both boards informally agreed on this during June and formally approved it on July 2. Meanwhile, Becker had prepared, at the request of both companies, a detailed memorandum dated July 1, 1963, upon the "Fairness and Equitability of the Plan of Merger." Although putting primary weight on the market value of GOA stock, this recognized potential values arising out of further sales of GOA plants as a relevant factor. The report stated, however, that any GOA stockholder, either alone or with the aid of an investment adviser, could estimate the potential sale value of the plants and

---

3. This was GOA's book value per share as of December 31, 1962.

other assets retained by GOA and, indeed, that a judgment on this was already reflected in the market price of GOA stock.[4] The memorandum concluded that the plan of merger was "fair and equitable to the shareholders of General Outdoor."

A draft of a proxy statement to stockholders of both companies seeking approval of the merger was filed with the SEC on July 19, 1963.[5] On August 20, the Assistant Director of the SEC's Division of Corporate Finance sent a 15 page single-spaced letter of comment[6] and asked that a revised draft be submitted for SEC review. This was transmitted in late August and accepted by the SEC without further comment. The Proxy Statement was mailed to stockholders on September 11, 1963, along with Notice of a Special Meeting of Stockholders to be held on October 11.

For purposes of this case the most important parts of the Proxy Statement are those under the heading "History, Business and Property of General Outdoor." This sketched the growth of GOA's outdoor advertising business up to the point where, in the latter half of 1961, it was operating 36 branches. The Statement recited that "During 1960 and 1961 General Outdoor continued to entertain as it had theretofore proposals by persons desiring to purchase outdoor advertising plants from it," and that "Particularly serious attention was given to offers to purchase its plants located in major cities where there was direct local poster competition and resulting low profit margins." It instanced the acceptance of the offer for the St. Louis branch.

The Statement went on to say that at about the same time Skogmo's acquisition of a majority interest brought to GOA's board a number of men with experience in other fields, primarily merchandising and finance, thereby opening the possibility of profitable diversifica-

---

4. The memorandum noted that the realization of the potential profits available from plant sales was subject to a variety of risks. Particular attention was called to the fact that, in their opinion on GOA's 1962 financial statements, Price Waterhouse & Co. had stated their inability "to form an opinion at this time as to the collectibility of the relevant notes receivable sold to banks and guaranteed by the company because of the 8-year average term of such notes and the short period of time which has elapsed since the date of such sales." While counsel stated at argument that the notes were by "shell" companies having no assets except the purchased plants, see 298 F.Supp. at 111, many of the notes were guaranteed by the owners of the companies. All have been collected, though some extensions of time were required.

5. At about the same time, Becker sent copies of parts of the draft proxy statement to the holders of Skogmo's privately placed 6% Notes, along with a letter, dated July 12, 1963, seeking their assent to amendments to the notes made necessary by the merger. In the letter Becker stated it was contemplated that Skogmo might sell additional advertising plants of GOA, "recovering the investment therein plus a profit," and that it might wish to bring these funds out of GOA, Inc., a newly-created, wholly-owned subsidiary, by way of retirement of notes owed to Skogmo, and therefore sought an amendment of the 6% Notes so as to allow dividends to be paid to Skogmo shareholders out of these funds. The letter added: "This is an especially important request in that we do, in our best present judgment, expect to be able to bring funds generated especially out of profits realized in GOA, Inc. into Gamble Skogmo by the retirement of capital notes . . . . "

6. The only comments at all pertinent to the issue here were requests that the portion of the statement entitled "Sale of Outdoor Advertising Plants" should be expanded to show that these had commenced only after the acquisition of control by Skogmo and to indicate "the reasons for such sale (liquidation of the advertising business)"; that a tabulation showing "the profitability of the branches sold as compared to branches retained" should be stated in a more meaningful fashion; and that the portion of the statement entitled "Continued Operation of Outdoor Advertising Business" "should be expanded to indicate whether there are any agreements, arrangements, understandings, negotiations, or discussions pending regarding . . . the sale of any additional advertising branches."

tion. "In addition the price obtained for the St. Louis branch, as well as the prices at which other outdoor advertising operations were then being bought and sold, demonstrated that the market value of a substantial portion of the company's plants was considerably in excess of book value."

The next paragraph read:

As a result of these factors and with a desire to diversify into other operating fields on a more profitable basis, General Outdoor sold a number of additional operating branches during the summer and early fall of 1962. These included a large number of competitive operations with relatively low profit margins. As it became clear that there were ready buyers for a large number of non-competitive plants, at attractive prices, sales of these also began to be made. As a result, by the end of 1962 General Outdoor had sold 23 of its 36 United States outdoor advertising branches, which accounted for approximately 36% of the total 1961 consolidated operating revenues of the Company. These branches were sold at individually negotiated prices aggregating $29,682,435, resulting in a profit of $14,184,368 after provision of $5,396,000 for federal and state taxes on income. The Company received $4,931,524 in cash down-payments and a total of $24,750,911 of notes receivable. The net proceeds were used to diversify the Company's operations as set forth in the following subsection headed "Diversification".

This was followed by a statement that in 1963 GOA had sold its Kansas City and Oklahoma City branches for $3,300,000 ($300,000 in cash and $3,000,000 in notes) for an after-tax profit of $1,523,015. The succeeding paragraph revealed that the plants sold on or before July 30, 1963, accounted for 35% of the outdoor advertising operating revenues and 37.9% of the profits in 1960, and 35.9% of the revenues and 40.6% of the profits in 1961. Then came a refer-

ence to the arrangements with the bank syndicate described above.

The fateful paragraph is this:

If the merger becomes effective, it is the intention of Gamble-Skogmo, as the surviving corporation, to continue the business of General Outdoor, including the policy of considering offers for the sale to acceptable prospective purchasers of outdoor advertising branches or subsidiaries of General Outdoor with the proceeds of any such sales, to the extent immediately available, being used to further expand and diversify operations now being conducted or which might be acquired and conducted by Gamble-Skogmo or its new, wholly-owned subsidiary, GOA, Inc. There have been expressions of interest in acquiring many of the remaining branches of General Outdoor and discussions have taken place in connection therewith, but at the present time there are no agreements, arrangements or understandings with respect to the sale of any branch and no negotiations are presently being conducted with respect to the sale of any branch.

After the Proxy Statement was disseminated, but before the stockholders' meeting, the SEC received a letter from Minis & Co., an Atlanta brokerage firm, objecting to the adequacy of the Proxy Statement. In response to this letter, Paul Judy, vice president of A. G. Becker & Co., Donald W. May, general counsel of GOA, and other representatives of Skogmo and GOA met in early October with Carl T. Bodolus, the SEC's branch chief responsible for evaluation of the Proxy Statement, and three representatives of Minis. The Minis representatives demonstrated by extrapolation from the information contained in the Proxy Statement regarding the profits obtained through previous plant sales that considerable profits might be realized on the sale of the remaining plants. They thought that this possibility should be highlighted in the Proxy Statement, which should include the fair market value of the remaining assets or projec-

tions of the anticipated profits on sales if there were to be sales. Mr. Bodolus replied, however, that such profits were subject to a variety of contingencies, that it was contrary to SEC policy to have that kind of prospective information in a Proxy Statement, and that he believed that under SEC regulations this was not permissible. In response to further questions raised by the Minis representatives, Bodolus inquired whether there had been discussions regarding future sales or whether any firm commitments had been made or were in the process of being made; the answer was that additional sales had been discussed, and that there might be future offers, but that no firm sales had been contracted or were in the process of being made.

One other meeting of significance which took place prior to the GOA stockholders' meeting should be noted. We have already referred to the interest displayed by John Kluge, president of Metromedia, in GOA's Chicago plant. On October 9, two days before the stockholders' meeting, GOA gave Metromedia updated six year statements of operations for both the profitable Chicago branch and the unprofitable New York branch. About the same time, Ryan and Kluge had a dinner meeting at which Kluge again indicated his interest in purchasing the Chicago plant. Ryan explained that he could not negotiate until "a meeting", obviously the GOA stockholders' meeting, had occurred, but that Kluge should be prepared to put up cash shortly thereafter. Ryan testified, but Kluge denied, that the discussion included the New York plant; the court credited Ryan, particularly because of other testimony that the treasurer of Metromedia had discussed with officials of the Bank of New York, on October 10, the possibility of obtaining funding for the contemplated purchase of the Chicago plant for $10,000,000 and the New York branch for $5,000,000.

The merger was approved at the October 11 stockholders' meeting and became effective on October 17. The next day, Kluge made a package offer for the New York and Chicago plants and by October 28 Skogmo had agreed to sell the Chicago and New York plants to Metromedia for $13,551,121 representing a pre-tax profit of $7,504,802. With the losing New York plant sold, there was no need to retain the other profitable plants as sweeteners, and sales proceeded apace. On December 2, Skogmo agreed to sell the Philadelphia and Washington plants to Rollins for $5,300,000, representing a pre-tax profit of $3,334,737. An agreement to sell the Mexican subsidiary to Rollins, on this occasion at a loss, was concluded in November. By July 13, 1964, GOA had contracted to sell all the United States plants which had remained at the date of the merger. Including the Mexican subsidiary, the sales prices amounted to $25,081,121 as against a book value of $10,576,418, representing a pre-tax profit of $14,504,703 and an after-tax profit of some $11,740,875—more than a 25% addition to GOA's net worth as of May 31, 1963, as shown in the balance sheet attached to the Proxy Statement.

## II.  *The Proceedings in the District Court*

In his first opinion, 298 F.Supp. 66, Judge Bartels found that the Proxy Statement was materially false or misleading in violation of SEC Rule 14a–9(a), on grounds we shall discuss below, and therefore held the defendant liable under section 14(a) of the Securities Exchange Act. He also held that Skogmo had breached its fiduciary obligations to the minority shareholders of GOA under applicable New Jersey law by its inadequate disclosures in the Proxy Statement and by accomplishing the merger through a plan which was unfair to the minority. Since restoring the parties to the pre-merger status quo was obviously impossible, the district judge held that the plaintiffs were entitled to restitution and that Skogmo must account for the profits it received from

the sale of GOA assets. He also prescribed that:

> After proper deduction for Skogmo's proportionate interest in General's assets as of the date of the merger, plaintiffs are entitled to the highest value since the date of the merger of all the assets transferred to Skogmo by General including post-merger appreciation of said assets less (i) Skogmo's proportionate share thereof, and (ii) the value of Skogmo stock as of the date of the merger received by those shareholders who have exchanged their shares or to be received by those who have not yet exchanged their shares.[7]

Arthur H. Schwartz, a distinguished member of the New York bar, was appointed as special master to hear and report on Skogmo's accounting. Extensive hearings were held. The two most sharply controverted issues were the value of GOA's two principal assets remaining after the sale of the plants, its 97.8% interest in Stedman and its 97.7% interest in Claude Neon, and when these values attained their maxima. The special master found the fall of 1968 to be the highest valuation date for Stedman and late 1969 to be such date for Claude Neon, and fixed values accordingly. He also allowed interest at 6½% on the minority shareholders' percentage of the proceeds of the plant sales from the date of the sales, and recommended that interest at the variable legal rate be allowed on the value of Stedman and Claude Neon from their valuation dates. From this he deducted the value of the convertible preferred stock, the dividends paid, and 5% interest thereon.[8] Subject to various adjustments, this resulted in an award to the plaintiffs, as of January 31, 1970, of $4,232,828.

Both sides excepted to the report. In his second opinion, 332 F.Supp. 644, the district judge reconsidered his ruling that damages should be computed on the basis of the highest intermediate value of Stedman and Claude Neon between the merger and the date of judgment. He now thought that, in addition to the the plants, the stockholders should be credited with their share of the actual value of Stedman and Claude Neon at the time of the merger. To this, he would add interest from the date of the merger at the rates set from time to time by the New York State Banking Board. There would then be deducted the value of the Skogmo convertible preferred stock received by the GOA minority stockholders plus dividends on the preferred stock and interest thereon at 5%, see note 8 *supra*. The matter was returned to the special master for further hearings.

Skogmo's apparent victory on the highest intermediate value issue proved to be somewhat pyrrhic in nature. The special master's second report found a balance of $12,062,416 in favor of plaintiffs as of December 31, 1971. While the figures in the two reports are not directly comparable, since the first report had recommended but not computed the interest on the share of the minority stockholders in the value of Stedman and Claude Neon, from the respective valuation dates in 1968 and 1969, the primary reason for the higher figure in the second report was that the reduction of $1,968,389 in their share of the valuation of Stedman and Claude Neon was more than counterbalanced by the addition of interest at the New York State Banking Board rate for the long period between the merger and the award, as against the 4½% dividends (plus 5% interest thereon) with which

---

7. An exception was made for any stockholder who voted for the merger with full knowledge of what the court considered to be non-disclosures in the Proxy Statement and Skogmo's breach of fiduciary obligation; the burden of establishing this was placed on Skogmo.

8. This was selected as representing the rate a stockholder would have received if he had placed his dividends in a savings account.

defendant was credited. Both parties again excepted, but the judge adopted the report with only minor modifications, 348 F.Supp. 979.

## III. *Liability*

Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n, makes it unlawful for any person to solicit any proxy "in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." Pursuant to this grant of authority, the SEC promulgated Rule 14a–9(a), 17 C.F.R. § 240.14a–9(a), prohibiting solicitation by means of a proxy statement "containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication . . . which has become false or misleading." Judge Bartels found the Proxy Statement disseminated by GOA to violate Rule 14a–9 by failing adequately to disclose the market value of GOA's advertising plants remaining unsold at the time of the merger and Skogmo's intent to realize the large profits available from the remaining plants by selling them shortly after the merger.

### A. *Was the Proxy Statement Misleading?*

One of the plaintiffs' principal attacks on the adequacy of the Proxy Statement was that GOA was bound to disclose its appraisals of the market value of the remaining plants and the existence and amount of the firm offers to purchase the unsold plants that it had received.[8a]

Skogmo countered that the SEC would not have allowed this. By a stroke of luck it was able to support its position not only by materials generally available but by the SEC staff's reaction in this very case to the suggestion of Minis & Co. that market values be disclosed in the proxy statement. In an attempt to obtain assistance on this issue, the court asked the Commission to file a brief as *amicus curiae.*

The SEC's brief has been the subject of considerable comment.[9] Its first section reaffirms the Commission's long-standing position that "in financial statements filed with the Commission, fixed assets should be carried at historical cost (less any depreciation) in the absence of any statute, rule, or specific Commission authorization to the contrary." A second section is headed, "The narrative or textual portions of a proxy statement must contain whatever additional material is necessary under the circumstances in order to make the proxy statement not misleading." So much is hardly controversial. But the heading of the third section reads:

> When a balance sheet in a proxy statement for a merger reflects assets at an amount that is substantially lower than their current liquidating value, and liquidation of those assets is intended or can reasonably be anticipated, the textual or narrative portion of the proxy statement must contain whatever available material information about their current liquidating value is necessary to make the proxy statement not misleading.

The text goes on to elaborate that while the corporation's own asking price may not be disclosed, "good faith offers from unaffiliated third parties to buy corporate assets for more than their book value must be disclosed if their omission

---

8a. Skogmo has not disputed that although the Proxy Statement was issued by GOA, it is liable for any deficiencies. See Securities Exchange Act, § 20(a).

9. *See, e. g.,* Fiflis & Kripke, Accounting for Business Lawyers 473–80 (1971);

Manne, Accounting and Administrative Law Aspects of Gerstle v. Gamble-Skogmo, Inc., 15 N.Y. Law Forum 304 (1969).

would render the proxy statement materially misleading." Similarly, the text states that, although appraisals generally cannot be disclosed because they may be misleading, existing appraisals of current liquidating value must be disclosed if they have been made by a qualified expert and have a sufficient basis in fact. The district judge seemingly adopted the Commission's statement of the governing principles, and found that Skogmo's failure to disclose its appraisals and firm offers made the proxy statement materially misleading. 298 F.Supp. at 91–92.

The assertion that the Commission would have permitted reference to "appraisals" made by GOA's own officials,[10] and the intimation that it would have required them had it known of their existence, but see note 10 *supra*, must have been as much a surprise to the Commission's branch chief who had refused to insist on a revision of the proxy statement to include appraisals because this was contrary to Commission policy, as it was to Skogmo's counsel. Rule 14a–9 has long carried a note giving examples "of what, depending upon particular facts and circumstances, may be misleading within the meaning of the rule"; the very first is "(a) Predictions as to specific future market values, earnings

or dividends." This note does not in terms refer to appraisals of assets at current market value and, indeed, the SEC in this case attempted to distinguish appraisals of present liquidating values from estimates of future earnings or profits in an effort to reconcile its position in favor of disclosure here with the stand it took in Sunray DX Oil Co. v. Helmerich & Payne, Inc., 398 F.2d 447 (10 Cir. 1968). The validity of this distinction is far from apparent, see Kripke, The SEC, The Accountants, Some Myths and Some Realties, 45 N.Y. U.L.Rev. 1151, 1200 (1970), particularly in the context of this case, where the appraisals hinged to no small degree on the ability of prospective purchasers to pay for the properties out of future earnings. But, more important, it is clear that the policy embodied in the note to Rule 14a–9 has consistently been enforced to bar disclosure of asset appraisals as well as future market values, earnings, or dividends. The Commission acknowledged this in its brief:

The Commission and its staff have traditionally looked with suspicion upon the inclusion of asset appraisals even in the text or narrative portion of proxy statements. It has been our experience that such appraisals are often unfounded or unreliable. For this

---

10. Despite the SEC's caution that it took no position "on the factual question whether the specific information relating to asset valuation that the plaintiffs claim should have been disclosed in the proxy statement met the guidelines for disclosure laid down in this memorandum," the judge moved swiftly from acceptance of the SEC's analytical framework to the conclusion that the "appraisals" here should have been disclosed. Even if we were to accept the SEC's general position, we would regard this conclusion as quite doubtful. The "appraisals" which plaintiffs argued should have been disclosed in the proxy statement apparently are the Green Book prepared by Gesme, the up-to-date valuations prepared in November 1962 by Dolan, and Gesme's March 1963 memorandum. So far as appears from the record, the officers of GOA did no more than take the earnings record of the plants and

extrapolate these to anticipated sales prices on the basis of GOA's changing experience in the sales of plants in other cities—much as the representatives of Minis & Co. did in their presentation to the SEC. We seriously doubt that this is what the SEC had in mind when it stated that it would allow the work of expert appraisers to be disclosed in proxy statements in some circumstances. See the tests set out in the SEC's brief at pp. 29–30. Although the district judge pointed out that the estimates of GOA's management turned out to be reasonably accurate, this hardly furnishes an adequate basis for determining, at the time the proxy statement was being prepared, on which side of the fine line articulated in the SEC's brief between those appraisals which must be disclosed and those which cannot be, the instant appraisals fall.

reason, the Commission's staff, on a case-by-case basis, has usually requested the deletion of appraisals that have been included in proxy statements.

The Commission further acknowledged that its branch chief had enforced this policy in his refusal to consider disclosure of asset appraisals in the Proxy Statement here, admitting that at the meeting recounted above, "a branch chief of the Commission's Division of Corporation Finance did express the staff's general policy against the inclusion of appraisals in a proxy statement."

However, the note to Rule 14a–9 states only that disclosure of appraisals "may be misleading" "depending upon particular facts and circumstances," and the SEC's brief attempts to capitalize upon this and clothe its longstanding policy against disclosure of appraisals with an appearance of flexibility and case-by-case analysis, as some of the foregoing quotations indicate. However desirable such a policy may be, we do not believe this is what it was in 1963. The Commission's examiners "are trained to strike at appraisal values as unacceptable whenever they read them in documents filed with the Commission." Fiflis & Kripke, supra note 9, at 472. See also id. at 470; Manne, supra note 9, at 315, 323. It has long been an article of faith among lawyers specializing in the securities field that appraisals of assets could not be included in a proxy statement.

There is nothing in the authorities cited by the Commission in support of the position taken in its brief which casts serious doubt on this conclusion. The Commission's principal reliance in its brief here was on an amicus brief it had filed in the well-known case of Speed v. Transamerica Corp., 99 F.Supp. 808 (D.Del.1951), modified and af-

firmed, 235 F.2d 369 (3 Cir. 1956). While we have no doubt that Speed was correctly decided, that case dealt with an inventory of a commodity, tobacco, about to be liquidated by the buyer, which was actively traded and whose market value could be ascertained with reasonable certainty on the basis of actual sales. No "appraisal" of market value was required, and the dangers that the SEC has preceived in the disclosure of appraised values were not present. And, of course, Speed did not involve proxy statements or the SEC's policy of not allowing disclosure of appraisals in them. As has been correctly said, "No one, the Commission included, has seriously believed that the Speed case stands for the general proposition that appraisals of assets must be disclosed to the shareholders." Manne, supra note 9, at 323.

The only other supporting references in the amicus brief were to two SEC litigation releases issued in the 1940's. Only one of these, SEC v. Standard Oil Co., Litigation Release No. 388 (Feb. 26, 1947), is of any relevance here. The SEC there brought an action under Rule 10b–5 to enjoin the defendants from purchasing the shares of minority shareholders or soliciting shareholders to exchange their common stock for preferred in connection with a merger without disclosing that the present value of the Company's oil reserves, as appraised by qualified outside engineers, was far greater than the value carried on the firm's balance sheet, and the litigation release reported that the defendants had agreed to entry of a consent order without admitting liability. The other litigation release reported only that the SEC had filed an action under Rule 10b–5 complaining of the failure of a brokerage firm to disclose the value of its marketable securities before repurchasing its debentures.[11] Such bits and

11. SEC v. Greenfield, Litigation Release No. 302 (Nov. 7, 1945). The Commission's brief also cited Millimet v. George F. Fuller Co., CCH Fed.Sec.L.Rep. ¶ 91,570 (S.D.N.Y.1965), complaint dismissed sub nom. Richland v. Crandall,

262 F.Supp. 538, 554–555 (S.D.N.Y. 1967), and CMC Corp. v. Kern County Land Co., 290 F.Supp. 695 (N.D.Cal. 1968). While these cases involved allegations by private plaintiffs that the failure to disclose appraised values made proxy

pieces, flushed out by industrious research, cannot retroactively overcome the general understanding embodied in the note to Rule 14a–9, regularly given effect by the Commission's able staff in dealing with lawyers who specialize in SEC matters, and repeated in this very case.[12]

■ The Commission's policy against disclosure of asset appraisals in proxy statements has apparently stemmed from its deep distrust of their reliability, its concern that investors would accord such appraisals in a proxy statement more weight than would be warranted, and the impracticability, with its limited staff, of examining appraisals on a case-by-case basis to determine their reliability. The Commission is now in the process of a thorough re-examination of its policy, and it appears that new rules on the permissible uses of appraisals and projections may shortly be forthcoming. See Statement by the Committee on Disclosure of Projections of Future Economic Performance, CCH Fed.Sec.L.Rep. ¶ 79,211 (Feb. 2, 1973). The SEC may well determine that its policy, while protecting investors who are considering the purchase of a security from the overoptimistic claims of management, may have deprived those who must decide whether or not to sell their securities, as the plaintiffs effec-

tively did here, of valuable information, as Professor Kripke has argued, Rule 10b–5 Liability and "Material Facts", 46 N.Y.U.L.Rev. 1061, 1071 (1971). But we would be loath to impose a huge liability on Skogmo on the basis of what we regard as a substantial modification, if not reversal of the SEC's position on disclosure of appraisals in proxy statements, by way of its *amicus* brief in this case.[13] Indeed, it was to protect against this that Congress enacted section 23(a) of the Securities Exchange Act, 15 U.S. C. § 78w, which provides that "No provision of this chapter imposing any liability shall apply to any act done or omitted in good faith in conformity with any rule or regulation of the Commission," notwithstanding any later amendment. While defendant's reliance here was on the Commission's consistent interpretation of its own rule, rather than on the terms of the rule itself, it is hard to attach any significance to this distinction when the effect of the Commission's interpretation was to lead counsel reasonably to believe Skogmo would not be allowed to make the references to "appraisals" which plaintiffs now claim were required.

■ The matter of disclosing "firm offers," however, may well stand differently.[14] Such offers, emanating

statements misleading, both complaints were dismissed without considering whether the SEC would have allowed such appraisals to appear in the proxy statement. As Professor Manne has said, *supra* note 9, at 323, the relevance of these holdings to the present case "is too tenuous to merit the space accorded them."

12. It is argued that Mr. Bodolus' position at the meeting in early October might have been different if the Proxy Statement had made clear that Skogmo had a fixed intention immediately to sell the remaining plants. We are not at all sure of this; in any event the judge's findings could not reasonably go so far. The most that could be found was that Skogmo intended vigorously to pursue the program of sales if adequate prices could be secured and that it had good reason to expect they

could be. We are confident that the SEC staff would not have allowed the appraisals to appear in the Proxy Statement even if this intention had been disclosed to it. What a court would have ruled if Minis had chosen to seek an injunction is not determinative here.

13. Even for the future the Commission should proceed by a rule or a statement of policy that would receive wider public attention than an *amicus* brief in a private suit. We note with approval that this is what it has apparently determined to do with respect to any proposed rule changes to allow use of projections.

14. When the Proxy Statement was prepared, in addition to the inconclusive discussions between Ryan and Kluge concerning the Chicago plant, and similar discussions with respect to other plants, GOA had received "firm offers" to pur-

from outside sources, do not have the potential of overstatement of prospects at the instance of management that has so alarmed the SEC about appraisals. Perhaps more important, there has not been a general understanding within the legal and accounting professions that reference to such offers in a proxy statement would not be permitted, as has existed with respect to appraisals. On the contrary, one of the Commission's earliest and best known decisions on purchases of stock by insiders, Ward La France Truck Corp., 13 S.E.C. 373 (1943), had held that a controlling shareholder violated Rule 10b–5 when he caused the corporation to repurchase the shares of some minority stockholders at $3 to $6 per share without disclosing that he had entered into an agreement to sell his shares at $45 per share and for the corporation thereafter to be liquidated with the remaining stockholders to receive $25 per share. The question has also arisen in cases of offers for stock purchasers or mergers by an outsider, and there is precedent that management, when endorsing one offer, must inform stockholders of any better ones. Indeed, the court in United States Smelting, Refining & Mining Co. v. Clevite Corp., CCH Fed.Sec.L.Rep. ¶ 92,691 (N.D.Ohio 1968), held that a management proxy statement which solicited shareholder support for a merger proposal violated Rule 14a–9 by failing to disclose a second merger offer at a higher price. *Id.* at 99,051–54. See also SEC v. Fruit of the Loom, Inc., Civ.No. 61–640 (S.D.N.Y.1961), *reported in* SEC 27th Annual Report 92–93 (1962) (consent order enjoining management violation of Rule 10b–5 by transmitting to shareholders and endorsing one tender offer without disclosing higher offer).

And we have very recently held that failure by the maker of a tender offer of its securities to disclose serious and active negotiations to sell a significant asset substantially below book value violated § 14(e), Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 480 F.2d 341, 367 (2 Cir. 1973). We see no significant difference between this and a failure to include the receipt of offers well in excess of book value in a proxy statement seeking approval of a merger, provided that the omission was material.

■ However, we need not determine the question of materiality of the omission of any reference to the firm offers, see note 14, *supra*. We rest our decision on the point that, quite apart from the SEC's *amicus* brief, the Proxy Statement must be faulted, on traditional grounds going back to the *Speed* case, *supra*, as failing adequately to disclose that, upon completion of the merger, Skogmo intended to pursue aggressively the policy of selling GOA's plants, which had already yielded such a substantial excess of receipts over book value.

The adequacy of the disclosure in the Proxy Statement, especially in what we have called the fateful paragraph, must be weighed against Judge Bartels' basic factual finding, 298 F.Supp. at 93,

> that Skogmo as the controlling stockholder and surviving corporation intended at least by and probably before July 19, 1963, to sell all the remaining outdoor advertising plants of General immediately after the merger.

The judge supported this by the following subsidiary findings:

> The intention to sell appears as an inescapable inference from the following facts: (i) General's earnings produced a mere 3% return on the esti-

chase the Philadelphia and Harrisburg plants, the Hartford plant, and the Binghamton plant. Although the only one of these offers which ran into seven figures was that for the Philadelphia and Harrisburg plants, each of the offers was well in excess of the book value of the plants and for the four plants the excess of the total offered price over book value

was approximately $2,400,000. Although the first and third of these offers were rejected prior to the merger, apparently because they were too low, subsequent events showed all of them to have been "within the ball park." None of the offers, or the offering prices, was disclosed in the Proxy Statement.

mated value of its outdoor advertising assets; (ii) after the sale of the St. Louis branch in early 1962, exceedingly high purchase prices were offered for outdoor advertising plants; (iii) the preparation in March, 1962 of the "Green Book", a reference book, showing the valuation of each branch substantially in excess of the cost; (iv) the adoption in July, 1962 by Bertin C. Gamble of the philosophy of "corporate mobility", meaning the sale of General's plants not earning a sufficient return and diversification by new investments; (v) the dismal appraisal of the outdoor advertising prospects of General by Ryan in June and July, 1962; (vi) the circulation by Ryan of historical earnings, projections and values on all plants to prospective purchasers from time to time between August, 1962 to the date of merger; (vii) agreements entered into by General in November and December, 1962, with The First National Bank of Chicago syndicate for the ultimate sale of a maximum of $55,000,000 of General's notes, at a time when General had received only $24,584,754 in plant notes; (viii) the sale by General by the end of 1962 of 7 of the 11 plants which Burr Robbins considered as top earners and necessary to form an operating nucleus, and General's willingness to sell Philadelphia, Washington and/or Chicago in a package deal with New York; (ix) statements to Walter Davies contained in Paul Judy's analysis of March 11, 1963, to the effect that upon an exchange of Skogmo stock for General stock on a share-for-share basis "Gamble would pick up approximately $37 in book value per Gamble share issued, such book value being approximately $13 under estimated final liquidation value per share"; (x) the purchase of advertising plants by Robbins on his own account in April, 1963, suggesting the discontinuance of this business by General; (xi) the poor operating figures of General in the summer of 1963, causing Robbins to remark that "they made you sick to your stomach"; (xii) Skogmo's knowledge at the time the proxy statement was prepared of the existence of many prospective purchasers for all the remaining plants, with the exception of Claude Neon and possibly New York, at gross sales prices far in excess of the book value; (xiii) the expressions of serious interest before the merger by the purchasers after the merger of all the remaining plants; (xiv) the immediate sale after the merger of New York and Chicago to Metromedia, and the discussions between the parties with respect thereto immediately prior to the merger; and (xv) negotiation efforts between Rollins Broadcasting Company and General from April, 1963 to the merger date, which resulted in completed agreements immediately after the merger on December 2, 1963.

Skogmo does not seriously maintain that these findings are clearly erroneous, F. R.Civ.P. 52(a). The only reasonable quarrel would be with the word "immediately" in the finding first quoted, see note 12 *supra*, but the result would not be different if this were changed to read "as soon as possible".

▮ In contrast to the court's finding of intention, the affirmative statement in the first sentence of the key paragraph in the Proxy Statement is that Skogmo intended "to continue the business of General Outdoor". The Statement had earlier described this to be just what its name implied, and most stockholders must have understood this sentence to mean that Skogmo intended to remain in the outdoor advertising business. True, earlier portions of the Proxy Statement had noted that part of the "business" consisted ·of selling plants, and the paragraph under scrutiny did say that the "business" that would be continued included "the policy of *considering* offers for the sale to acceptable prospective purchasers of outdoor advertising branches" (emphasis supplied) and using the proceeds for further diversification. But, particular-

ly with the disclaimer in the final sentence, that "at the present time there are no agreements, arrangements or understandings . . . and no negotiations are presently being conducted with respect to the sale of any branch," [15] only the most sophisticated reader would conclude that Skogmo had the firm intention, which the Judge reasonably found, not simply to "consider" offers but actively to solicit them. While "corporations are not required to address their stockholders as if they were children in kindergarten," Richland v. Crandall, 262 F.Supp. 538, 554 (S.D.N.Y. 1967), it is not sufficient that overtones might have been picked up by the sensitive antennae of investment analysts.

Moreover, there were other facts that made the fateful paragraph even more likely to mislead the minority stockholders into believing that Skogmo was not planning to sell all the remaining outdoor advertising plants. Earlier the Statement had explained that "the drop in profitability of the remaining outdoor advertising branches in the first five months of 1963 as compared to the first five months of 1962" was the result of three "non-recurring events." Two of these were a decline in employee morale "[a]s a result of uncertainty as to the future of the remaining branches" and inability to cut general and administrative expenses as rapidly as branches were sold. The fair inference was that management expected the profitability of the outdoor advertising business to pick up after the merger because the cause of these "non-recurring events", the plant sales, would not recur, whereas in fact Skogmo intended they should—to the point of extinction. Again, it was stated that Robbins, who "has been with General Outdoor since 1925 and has been President since 1951," was expected to take office as president of the Skogmo subsidiary "which will carry on the

---

15. Plaintiffs contend that even if the last sentence were literally true, it was nevertheless bad under Rule 14a–9 since it omitted to state that the only reason why there were no pending negotiations was that these had been deliberately suspended during the period when the Proxy Statement was being cleared through the SEC and submitted to the stockholders. Judge Bartels found that this raised a "borderline question," 298 F.Supp. at 95, but eventually concluded that this omission was not material in itself and did not cause any other statement in the proxy material to be misleading. In view of our holding that the Proxy Statement was misleading on other grounds, we need not decide this question.

Plaintiffs also urge that the October 9 meeting between Ryan and Kluge which brought to the fore the sale of the Chicago and New York plants, representing over half of the unsold plants in terms of book value and sales price, required a correction of the Proxy Statement under the final clause of Rule 14a–9(a). In addition to challenging this on the merits, defendant answers that it would be impossible to prepare and circulate a proxy statement such as this if the statement had constantly to be amended, and points out the mechanical difficulties of a last-minute amendment to a proxy statement, which would have to include an opportu-

nity for shareholders to revoke all proxies already granted. While, in view of our holding that the Proxy Statement was misleading on other grounds, we likewise find it unnecessary to rule on this argument, we cannot suppose that management can lawfully sit by and allow shareholders to approve corporate action on the basis of a proxy statement without disclosing facts arising since its dissemination if these are so significant as to make it materially misleading, and we have no doubt that Rule 14a–9 is broad enough to impose liability for non-disclosure in this situation. See General Time Corp. v. Talley Industries, Inc., 403 F.2d 159, 163 (2 Cir. 1968), cert. denied, 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969). Although we recognize the practical difficulties, the answer may be that a corporation in the stance occupied by GOA in the spring and summer of 1963 must forego a merger until an on-going program significantly affecting the value of its stock has been either accomplished or abandoned, just as the insiders in SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 850 n. 12 (2 Cir. 1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), while having good reason not to disclose the results of the first drill core, were bound not to purchase stock until the information became generally available.

business now conducted by General Outdoor"; Robbins was an outdoor advertising man, not a real estate salesman. Indeed, at a later point the Statement explicitly noted that General Outdoor would transfer to this Skogmo subsidiary "its entire outdoor advertising business", which would "continue to be managed by the same officers and substantially the same directors as General Outdoor". Moreover, many, probably most, of the GOA stockholders receiving the Proxy Statement of September 11, 1963, had received, only five months earlier, GOA's quarterly letter of April 11, 1963, quoting the resolution, adopted by its directors on that day, announcing that GOA would continue to operate its outdoor advertising plants with the sole exception of Oklahoma City. While, according to Robbins, this resolution was passed to improve employee morale, the combination of it with the lack of further plant sales (save the closing of the Oklahoma City sale) contributed to the misleading character of the statement of intention in the Proxy Statement.

We recognize that, in thus branding the Proxy Statement as misleading, the district judge and we possess an advantage of hindsight that was not available to the draftsman. It would not have been proper to say that Skogmo *was going to sell* all the remaining plants, when, even with the encouragement that had been received, there was no assurance that it could do this on satisfactory terms. But the English language has sufficient resources that the draftsman could have done better than he did and more accurately expressed Skogmo's true intention to the stockholders. If only the first sentence of the fateful para-

graph had said something like "including a policy of aggressively seeking to dispose of the remaining outdoor advertising branches or subsidiaries of General Outdoor through sales to acceptable prospective purchasers on advantageous terms in the range of those that have been achieved in the past," we would at least have had a very different case.

### B. *What Is the Standard of Culpability in Suits for Damages for Violation of Rule 14a–9?*

In contrast to the large quantity of ink that has been spilled on the issue whether a plaintiff seeking damages under Rule 10b–5 must make some showing of "scienter" and, if so, what, there has been little discussion of what a plaintiff alleging damage because of a violation of Rule 14a–9(a) must show in the way of culpability on the part of a defendant.[16] Neither of the Supreme Court decisions concerning private actions under section 14(a), J. I. Case Co. v. Borak, *supra*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423, or Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), casts light on the problem.

Judge Bartels held, 298 F.Supp. at 97, that "the basis for incorporating scienter into a Rule 10b–5 action does not exist in a Rule 14a–9 suit," and that "Negligence alone either in making a misrepresentation or in failing to disclose a material fact in connection with proxy solicitation is sufficient to warrant recovery." The judge agreed in substance with Judge Mansfield's analysis in Richland v. Crandall, *supra*, 262 F.Supp. at 553 n.12, to the effect that one strong ground for holding that Rule 10b–5 re-

16. Our discussion of this point is limited to the rights of persons who were invited by a proxy statement to participate in the taking of corporate action involving a change in the character of their securities, as in a sale of assets or a consolidation or merger. It does not include persons who have traded because of information in such a proxy statement, for whom the statement would seem to stand no differently from, say, an annual re-

port to stockholders. We likewise do not pass on the principles that should govern liability of directors and other individuals having some responsibility for such a statement, as distinguished from a controlling corporation which has been the beneficiary of the action that was induced. See Jennings & Marsh, Securities Regulation: Cases and Materials 1358–59 (3d ed. 1972).

quires a showing of something more than negligence in an action for damages is that the statutory authority for the Rule, section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j, is addressed to "any manipulative or deceptive device or contrivance," a point later stressed in the writer's concurring opinion in SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 868 (2 Cir. 1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L. Ed.2d 756 (1969), whereas section 14(a) contains no such evil-sounding language.

We think there is much force in this. See Gould v. American Hawaiian S. S. Co., 351 F.Supp. 853, 861–863 (D.Del. 1972); 5 Loss, Securities Regulation 2864–65 (2d ed. supp.1969). Although the language of Rule 14a–9(a) closely parallels that of Rule 10b–5, and neither says in so many words that scienter should be a requirement, one of the primary reasons that this court has held that this is required in a private action under Rule 10b–5, Shemtob v. Shearson, Hammill & Co., 448 F.2d 442, 445 (2 Cir. 1971); Lanza v. Drexel & Co., 479 F.2d 1277, 1304, 1305 (2 Cir. 1973), is a concern that without some such requirement the Rule might be invalid as exceeding the Commission's authority under section 10(b) to regulate "manipulative or deceptive devices." See SEC v. Texas Gulf Sulphur Co., supra, 401 F.2d at 868 (Friendly, J., concurring); Lan-

za v. Drexel & Co., supra, 479 F.2d at 1305; 3 Loss, supra, at 1766 (2d ed. 1962); 6 id. at 3883–85 (Supp.1969). In contrast, the scope of the rulemaking authority granted under section 14(a) is broad, extending to all proxy regulation "necessary or appropriate in the public interest or for the protection of investors" and not limited by any words connoting fraud or deception. This language suggests that rather than emphasizing the prohibition of fraudulent conduct on the part of insiders to a securities transaction, as we think section 10(b) does, in section 14(a) Congress was somewhat more concerned with protection of the outsider whose proxy is being solicited. Indeed, it was this aspect of the statute that the Supreme Court emphasized in recognizing a private right of action for violation of section 14(a) in Borak, 377 U.S. at 431–432, 84 S.Ct. 1555.[17] We note also that while an open-ended reading of Rule 10b–5 would render the express civil liability provisions of the securities acts largely superfluous, and be inconsistent with the limitations Congress built into these sections, see SEC v. Texas Gulf Sulphur Co., supra, 401 F.2d at 867–868; 3 Loss, supra, at 1785, a reading of Rule 14a–9 as imposing liability without scienter in a case like the present is completely compatible with the statutory scheme.[18]

17. For similar reasons, we do not think that this court's recent holding in Chris-Craft Industries, Inc. v. Piper Aircraft Corp., supra, 480 F.2d at 362, that scienter must be proved in a private action under section 14(e) of the Securities Exchange Act, in which Congress in 1968 adopted the language of Rule 10b–5 and applied it to tender offers, is inconsistent with the result we reach here. In that connection Judge Mansfield noted, 480 F. 2d at 397:

Congress' use of the words "fraudulent," "deceptive" and "manipulative" in § 14(e), when coupled with the partially similar language and the legislative history of the earlier-enacted § 10(b), indicates that its purpose was not to punish mere negligence . . . .

18. It has been argued that imposing liability for negligent misrepresentations or

omissions under Rule 14a–9 would be inconsistent with the congressional intent in enacting section 18 of the 1934 Act, 15 U.S.C. § 78r, which expressly creates liability in a private civil action for making materially false or misleading statements in any document filed with the Commission but provides that no liability shall be imposed if the defendant "acted in good faith and had no knowledge that such statement was false and misleading." See Gould v. American Hawaiian S.S. Co., supra, 351 F.Supp. at 863. But section 18 applies broadly to any document filed with the Commission, whereas section 14 was specifically directed at proxy regulation. Moreover, most of the documents within the scope of section 18 are not distributed to stockholders for the purpose of inducing action; we see nothing anomalous about applying a different

■ Although this does not mean that scienter should never be required in an action under Rule 14a–9, a number of considerations persuade us that it would be inappropriate to require plaintiffs to prove it in the circumstances of this case. First, many 10b–5 cases relate to statements issued by corporations, without legal obligation to do so, as a result of what the SEC has properly called "a commendable and growing recognition on the part of industry and the investment community of the importance of informing security holders and the public generally with respect to important business and financial developments." Securities Act Release No. 3844 (Oct. 8, 1957). Imposition of too liberal a standard with respect to culpability would deter this, particularly in light of the almost unlimited liability that may result. See SEC v. Texas Gulf Sulphur Co., *supra*, 401 F.2d at 867. Such considerations do not apply to a proxy statement required by the Proxy Rules, especially to one, like that in the present case, which serves many of the same functions as a registration statement, compare Gould v. American Hawaiian S. S. Co., *supra*, 351 F.Supp. at 863 n.12. Rather, a broad standard of culpability here will serve to reinforce the high duty of care owed by a controlling corporation to minority shareholders in the preparation of a proxy statement seeking their acquiescence in this sort of transaction, a consideration which is particularly relevant since liability in this case is limited to the stockholders whose proxies were solicited.[19] While "privity" is not required for most actions under the securities laws, its existence may bear heavily on the appropriate standard of culpability. See Ruder, *Texas Gulf Sulphur*—The Second Round: Privity and State of Mind in Rule 10b–5 Purchase and Sale Cases, 63 Nw.U.L.Rev. 423, 437 (1968).

■ Furthermore, the common law itself finds negligence sufficient for tort liability where a person supplies false information to another with the intent to influence a transaction in which he has a pecuniary interest. Restatement (Second) of Torts § 552 (Tent. Draft No. 12, 1966); Prosser, Torts § 107, at 706–09 (4th ed. 1971); Gediman v. Anheuser Busch, Inc., 299 F.2d 537, 543–546 (2 Cir. 1962). This is particularly so when the transaction redounded directly to the benefit of the defendant, in which case the common law would provide the remedies of rescission and restitution without proof of scienter. See Prosser, *supra*, § 105, at 687–89; 3 Loss, *supra*, at 1626–27. It is unlikely that section 14(a) and Rule 14a–9 contemplated less.

■ We thus hold that in a case like this, where the plaintiffs represent the very class who were asked to approve a merger on the basis of a misleading proxy statement and are seeking compensation from the beneficiary who is responsible for the preparation of the

---

standard of culpability in actions concerning misrepresentations in proxy statements which are so distributed than in those involving reports which were merely filed with the Commission. In short, we see no incompatibility between our holding here and the limitations Congress imposed in section 18.

In any event, we note that a corporation in Skogmo's position would be unable to take advantage of the defenses in section 18. The statute requires that both good faith and lack of knowledge be shown to escape liability under that section. But, as Jennings and Marsh point out, note 20 *infra*, a corporation would be charged with the knowledge of all its agents and it is most unlikely that it could issue a false or misleading proxy statement without "knowledge" of the facts which made it false or misleading.

19. We are not dealing here with statements issued "in the hurly-burly of election contests," see General Time Corp. v. Talley Industries, *supra*, 403 F.2d at 162, but with a statement which defendant had ample time to prepare and revise. A less strict view could well be taken with respect to statements of the former sort, whether this be phrased as requiring more than negligence or as recognizing the need for haste as a factor to be considered in determining negligence.

statement, they are not required to establish any evil motive or even reckless disregard of the facts.[20] Whether in situations other than that here presented "the liability of the corporation issuing a materially false or misleading proxy statement is virtually absolute, as under Section 11 of the 1933 Act with respect to a registration statement," Jennings & Marsh, Securities Regulation: Cases and Materials 1358 (3d ed. 1972), we leave to another day.

### C. Was the Inadequacy in the Proxy Statement Material?

The first of the two Supreme Court cases dealing with civil liability under Rule 14a–9(a), J. I. Case Co. v. Borak, *supra,* 377 U.S. 426, 84 S.Ct. 1555, 12 L. Ed.2d 423 raised no question with respect to materiality. However, the second, Mills v. Electric Auto-Lite Co., *supra,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed. 2d 593 has often been regarded as setting forth a clear definition of "materiality" for purposes of damage suits under Rule 14a–9(a) in Mr. Justice Harlan's statement, 396 U.S. at 384, 90 S.Ct. at 621, that:

> Where the misstatement or omission in a proxy statement has been shown to be "material," as it was found to be here, that determination itself indubitably embodies a conclusion that the defect was of such a character that it might have been considered important by a reasonable shareholder who was in the process of deciding how to vote.

This statement, however, was not in fact intended to establish a definition of materiality. Certiorari was granted in *Mills* to resolve the "basic issue" raised by the holding of the court of appeals that it must be shown that the false or misleading statements in the proxy materials actually caused the shareholders to approve a merger, and that if the merger were shown to be fair, it would be conclusively presumed that a sufficient number of the stockholders would have approved it regardless of the defect in the proxy statement and thus there would be no liability. No issue as to the materiality of the misstatements or omissions was presented in the petition for certiorari, and the Court specifically noted that it would not consider respondents' argument that the proxy statement was not materially misleading, 396 U.S. at 381, n.4, 90 S.Ct. 616. Justice Harlan's statement must thus be read as a characterization of the minimum that all would agree was "embodied" in the district court's conclusion that the defect was material, beyond which the Justice found he need not go in order to support his holding that this showing of materiality was sufficient evidence of causal relationship between the violation and the injury to dispense with a further showing of causation in fact, rather than a determination of the proper test of materiality. See Jennings & Marsh, *supra,* at 1354–55.

Moreover, Justice Harlan cited with apparent approval two decisions of this court which set out a somewhat higher standard of materiality, 396 U.S. at 384 n.6, 90 S.Ct. 616. Thus, he cited Judge Waterman's opinion in List v. Fashion

---

20. We recognize that this court has on occasion phrased the test of scienter in terms of whether the defendant had knowledge of the facts that were omitted or misstated, see Globus v. Law Research Service, Inc., 418 F.2d 1276, 1290–1291 (2 Cir. 1969), cert. denied, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970); Chris-Craft Industries, Inc. v. Piper Aircraft Corp., *supra,* 480 F.2d at 362, and the conceptual problem noted by Professors Jennings and Marsh, *supra* note 16, at 1358, that such a test, as applied to the corporation issuing a false or misleading proxy statement, would result in virtually absolute liability because of the agency doctrine that a corporation is charged with the knowledge of all its agents. However, it seems to us that in this type of case the scienter issue would revolve around the intent with which the proxy statement is prepared, and whether it was wilfully misleading or merely negligently drafted. By our holding here that scienter need not be shown, we do not mean to imply that plaintiffs' proof could not have been held sufficient to show more than negligence. That issue simply does not need to be decided.

Park, Inc., 340 F.2d 457, 462 (2 Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965), a face-to-face 10b–5 case, where it was held, quoting from the Restatement of Torts § 538(2)(a) (1938), that the basic test of materiality is whether "a reasonable man *would* attach importance [to the fact misrepresented] in determining his choice of action in the transaction in question" (emphasis supplied). See also SEC v. Texas Gulf Sulphur Co., *supra*, 401 F.2d at 849. The Justice also cited the writer's statement in General Time Corp. v. Talley Industries, Inc., 403 F.2d 159, 162 (2 Cir. 1968), cert. denied, 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969), that the test was whether "taking a properly realistic view, there is a *substantial* likelihood that the misstatement or omission may have led a stockholder to grant a proxy to the solicitor or to withhold one from the other side, whereas in the absence of this he would have taken a contrary course" (emphasis supplied).[21]

■ We think that, in a context such as this, the "might have been" standard mentioned by Mr. Justice Harlan sets somewhat too low a threshold; the very fact that negligence suffices to invoke liability argues for a realistic standard of materiality. Justice Harlan's next sentence in *Mills*, that the defect must "have a significant *propensity* to affect the voting process," 396 U.S. at 384, 90 S.Ct. at 621 (emphasis in original), comes closer to the right flavor. While the difference between "might" and "would" may seem gossamer, the former is too suggestive of mere possibility, however unlikely.[22] When account is taken of the heavy damages that may be imposed, a standard tending toward probability rather than toward mere possibility is more appropriate. We therefore adhere to this court's formulations of the test of materiality quoted above.

■ We hold, however, that the deficiency in the Proxy Statement was material under this slightly higher standard, even though we do not join in the district judge's condemnation of it for failure to disclose appraisals. At the time of the merger, the minority shareholders of GOA were required to make an investment choice between retaining their shares in GOA, a firm with poor earnings prospects if it remained in the outdoor advertising field but also with the possibility of substantial extraordinary profits from liquidation of that business, or exchanging them for a small premium for the Skogmo convertible preferred, a security involving much less risk but with a correspondingly reduced interest in the profits potentially available through sales of advertising plants. Certainly the intent of those in control of GOA would be a significant factor in a reasonable shareholder's decision whether or not to vote for the merger. If Skogmo in fact intended to continue the outdoor advertising business of GOA despite the poor earnings picture, as the Proxy Statement indicated, a reasonable GOA stockholder might well have opted for the down-side protection of the Skogmo convertible preferred stock and been willing to give up some of his interest in the potential plant sales profits, which, it may have appeared, might never be realized. On the other hand, if the Proxy Statement had adequately disclosed Skogmo's true intention to seek to

21. Although the Court has recently used "might have considered" language again, in a particularly egregious 10b–5 case, Affiliated Ute Citizens v. United States, 406 U.S. 128, 153–154, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), this case also did not involve any issue of materiality; the question Mr. Justice Blackmun was dealing with was whether plaintiffs had to establish their reliance on defendants' misrepresentations. Moreover, Justice Blackmun cited with seeming approval this court's decision in SEC v. Texas Gulf Sulphur Co., *supra*, 401 F.2d at 849, where Judge Waterman reiterated the test of materiality set out in *List*, *supra*.

22. The point is obviously of more importance when a judge must instruct a jury than when, as here, the case is tried to him.

dispose of all the remaining outdoor advertising plants as soon as possible, and its expectation that it could do this on favorable terms, the same stockholder would have realized that there was substantially less risk involved in retaining his GOA stock and would have been more likely to focus on the profits available from the sales of plants. In view of the magnitude of these potential profits—sales of the remaining outdoor advertising plants yielded an after-tax profit of $11,740,875, representing a 26% addition to GOA's net worth as of May 31, 1963—a reasonable stockholder, even one who recognized the benefits of the merger, would probably have considered whether the merger should not at least be postponed until this uncertainty was resolved or demanded an upward revision of the terms,[23] failing which he would have voted against the merger and exercised his appraisal rights under New Jersey law.[24] The potential increase in book value had seemed important to Skogmo's investment advisor, aware of Skogmo's intention to liquidate GOA, in March 1963; it would have seemed equally so to a reasonable GOA stockholder, apprised of that intention, in September.

We thus hold that the district court correctly held Skogmo liable for damages for violating Rule 14a–9(a). We therefore need not consider plaintiffs' claim that the merger was a breach of fiduciary obligation under state law, since plaintiffs do not seriously contend that predicating liability on the latter theory would result in a higher measure of damages.

### IV. *Damages*

Both sides attack the method used by the district judge for computing damages. The two major attacks are plaintiffs' contention that the judge erred in reconsidering the "highest intermediate value" theory of his first opinion, 298 F.Supp. at 104, and allowing defendant to account for the Stedman and Claude Neon shares at their value at the date of the merger, see 332 F.Supp. at 646–648; and defendant's claim that allowance of interest of approximately 7% per annum on what plaintiffs gave up as against a credit of 4½% dividends (plus 5% interest on each payment) on what they received, resulting in an effective interest rate of approximately 9½% on the difference, was inappropriate.

Here again, while the *Borak* case affords no assistance, there are a few remarks in *Mills,* 396 U.S. at 388–389, 90 S.Ct. 616, which at least recognize the difficulties of the problem. After mentioning the possibility of setting the merger aside, which everyone recognizes to be impracticable here, as it also was in *Mills,* Mr. Justice Harlan spoke of monetary relief. He said that "[w]here the defect in the proxy solicitation relates to the specific terms of the merger, the district court might appropriately order an accounting to ensure that the shareholders receive the value that was represented as coming to them," a remark seemingly addressed to exaggerated statements of the value of the securities to be received rather than to a case like the present where the trouble is an inadequate statement of the value of the securities to be sold. Turning to a situ-

---

23. The per share value of the Skogmo convertible preferred issued to the GOA stockholders, as determined by the district court, 348 F.Supp. at 987, closely approximated the per share book value of GOA, see 298 F.Supp. at 83.

24. The merger agreement contained the usual provision reserving to the two Boards of Directors the right to refrain from making the merger effective in light of the number of dissents, a right which is often exercised when dissents are numerous. Even if sufficient dissenting votes to block approval of the merger by the required two-thirds of the GOA shareholders would not have been cast, there might well have been enough to cause Skogmo to reconsider whether it should go through with the merger at this time. In either event, this would not have prevented a revival of the merger after the plants had been sold, or a revision of the terms to reflect the potential gain.

ation where the misleading aspect of the solicitation did not relate to the terms of the merger, as in *Mills,* he said that "damages should be recoverable only to the extent that they can be shown." Apparently still thinking of that situation, he added that if commingling makes it impossible to establish direct injury, "relief might be predicated on a determination of the fairness of the terms of the merger at the time it was approved." With characteristic caution, he concluded that "our singling out of some of the possibilities is not intended to exclude others." We read all this as commanding the lower courts to do their best to achieve fair compensation for injured plaintiffs without being too draconian on defendants, at least in a situation where the inadequacy of a proxy statement may lie more in a failure of articulation than in an outright desire to deceive.

Plaintiffs' argument that the district court erred in not awarding them credit for the appreciation in value since the merger of Stedman and Claude Neon takes off from the well-known decision in Janigan v. Taylor, 344 F.2d 781, 786–787 (1 Cir.), cert. denied, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965), recently approved and applied in Affiliated Ute Citizens v. United States, 406 U.S. 128, 155, 92 S.Ct. 1456, 31 L. Ed.2d 741 (1972). These cases hold that a defrauded seller suing the purchaser for violation of the federal se-curities laws may recover the profits obtained by the purchaser with respect to the securities. Both these cases, however, involved face-to-face dealings wherein the defendant had purchased stock at a low price by misrepresenting its value and had resold it prior to suit at a large profit. Skogmo does not dispute that once liability is established, this principle justifies an award to plaintiffs of the profits it realized on the sales of all the outdoor advertising plants, which were completed within nine months after the merger.

Plaintiffs argue, however, that the rationale of *Janigan* goes beyond this and requires that they be credited with the post-merger appreciation of the unsold holdings as well. The court in *Janigan* reasoned that the wrongdoer should not be allowed to profit from his wrong, and that the courts should require him to disgorge his profits to prevent his unjust enrichment, even if this would give the defrauded plaintiff the benefit of a windfall. Plaintiffs argue that defendants here are profiting from the appreciation of the properties obtained unlawfully through the merger, whether or not this profit has been realized; they argue that these properties could have been sold at a profit during this period, and, indeed, suggest that sale of Claude Neon and Stedman may have been deliberately withheld until after final judgment in this action.[25]

**25.** We are informed that since the judgment below was entered, Skogmo has sold its interest in Claude Neon to a Canadian subsidiary of Combined Communications Corp. for $18,000,000, of which $16,000,-000 was in cash and $2,000,000 in notes. This sale was completed in January 1973. See Wall St.J., Jan. 19, 1973, at 2, col. 2; *id.,* Dec. 7, 1972, at 3, col. 4. Combined Communications had first expressed interest in purchasing Claude Neon in 1969, at which time it offered $10,000,000 in Canadian currency for the stock of Claude Neon. The Special Master, taking this offer into account, had found in his first report that the maximum value of Claude Neon was $14,000,000, which was reached in October 1969. His second report valued Claude Neon at $13,250,000 as of the date of the merger, and this valuation was adopted by the district judge in the final accounting, 348 F.Supp. at 984–985.

The Special Master's first report found that the highest value of Stedman was $28,000,000, which was attained in the fall of 1968. The second report valued Stedman at $24,250,000 as of the date of the merger, and this was the value adopted by the district judge, *id.* Although the Special Master noted that the possibility of selling Stedman had been discussed with prospective purchasers, he said in his first report, filed in December 1970, that "no asking price has yet been established for Stedman," and that "the possibility of a sale of Stedman is not very advanced."

A second rationale supporting the *Janigan* rule in some situations is provided by the Restatement of Restitution § 151, comment c (1937). Reasoning that the defrauded seller is entitled to be put in substantially the same position he would have occupied absent the fraud, it would allow the seller to recover the profits realized or the appreciation in value of the securities on the theory that he would have otherwise been in a position to obtain these profits for himself. See also Zeller v. Bogue Electric Mfg. Corp., 476 F.2d 795, 802 n. 10 (2 Cir. 1973). It is primarily this second rationale that provides the support for plaintiffs' further argument that the award should be based on the highest intermediate value of the assets of GOA between the date of the merger and the date of judgment. The argument runs as follows: If the disclosures in the Proxy Statement had been adequate, the GOA stockholders would not have approved the merger. If the merger had not occurred, GOA would have retained the stock of Stedman and Claude Neon and the directors would have been able to sell them at a profit at a later time. Since Skogmo cannot show at what time that would have been or that the sale would have been made at any lower price, it must be charged with the highest intermediate value of each.

We would agree that the *Janigan* principle is not confined to situations where the purchaser resells within a short time, and that in a proper case a court could award a plaintiff the unrealized appreciation of securities obtained through fraud, see, *e.g.*, Baumel v. Rosen, 412 F.2d 571, 575–576 (4 Cir. 1969), cert. denied, 396 U.S. 1037, 90 S. Ct. 681, 24 L.Ed.2d 681 (1970), notwithstanding Skogmo's suggestion that this would somehow contravene the mandate of *Mills* that "damages should be recoverable only to the extent that they can be shown." As Justice Harlan had earlier said, 396 U.S. at 386, 90 S.Ct. at 622, "[i]n devising retrospective relief for violation of the proxy rules, the federal courts should consider the same factors that would govern the relief granted for any similar illegality or fraud." But this does not mean that the district judge erred in not requiring Skogmo to account for the unrealized appreciation in the value of Stedman and Claude Neon here.

While plaintiffs' argument is simple, it is thus too simple. In the first place, it cannot be said that in the absence of the misrepresentations in the Proxy Statement there was a likelihood that GOA would have realized profits from sale of these holdings. As pointed out in our discussion of materiality, an adequate disclosure would not necessarily have led to an abandonment of the idea of a merger, which had much to recommend itself to the minority stockholders of GOA; the utmost consequences would likely have been a demand for postponement until the plant sales had been effected, a revision of the terms to reflect the potential gains on the sale of the plants, or the exercise of appraisal rights. Moreover, no one, either in GOA or in Skogmo, had any idea of selling the Stedman stock or the Claude Neon stock at the time of the merger, or for many years afterwards, see note 25 *supra*. And even if GOA might have sold these stocks, the assumption that it would have sold each at its highest value is, as Judge Bartels found, 332 F.Supp. at 647, "too untenable and speculative to support an award of damages" in the circumstances of this case.[26]

---

26. Myzel v. Fields, 386 F.2d 718, 742–749 (8 Cir. 1967), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968), frequently cited as supporting the highest intermediate value theory in litigation under the federal securities laws, scarcely goes so far. The court simply refused to reverse because of an instruction that "if the jury found that the plaintiffs, upon a complete disclosure, would have retained the stock, then the jury could consider 'the subsequent increases in the value of the stock over . . . a reasonable period.'" 386 F.2d at 745. The court emphasized that "The damages given essentially reflect a proper measure of damages for deceit based upon an unknown fluctuating value of stock of a closed

We do not regard this result as allowing defendant to be unjustly enriched or to profit from its wrong. The crucial fact here is that the misrepresentations in the Proxy Statement related only to the sales of plants, as to which Skogmo's liability for profits is conceded. If the merger had been accomplished, whether in 1963 or a year later, on somewhat better terms for the GOA stockholders, adequately reflecting and disclosing the potential profits from plant sales, they would have had no conceivable claim for the post-merger appreciation of the Stedman or Claude Neon shares. In these circumstances, awarding plaintiffs the profits on the plant sales and the value of the unsold assets, together with pre-judgment interest at a substantial rate, amply deprives Skogmo of profit from its wrong. To go further and hold Skogmo for any appreciation in the value of Stedman or Claude Neon over the long period between the merger and the judgment below—nearly nine years—is not required by this equitable principle. The passage of time introduces so many elements—here, for example, the beneficial effects of Skogmo's management—that extreme prolongation of the period for calculating damages may be grossly unfair.[27] Skogmo asserts that the nexus between the misrepresentations and the damage award would be too thin if this were stretched to include appreciation of the Stedman and Claude Neon shares,[28] and much too thin if held to justify an award based on their highest intermediate value. For the reasons indicated, we agree.

The point in regard to the computation of interest is troubling. The judge took the share of the GOA minority stockholders in the value on the date of

corporation *under the particular circumstances surrounding the case.*" 386 F.2d at 749 (emphasis in original). Moreover, so far as this court is concerned, plaintiffs' "highest intermediate value" theory seems to run counter to Marcus v. Otis, 168 F.2d 649 (2 Cir. 1948), on which they rely. On the issue of damages the controlling opinion is not that of Judge L. Hand, 168 F.2d at 657–658, but that of Judge A. N. Hand, joined by Judge Chase, 168 F.2d at 660.

Since it has now become somewhat the vogue to consider the "Chimney Sweeper's Jewel Case," Armory v. Delamirie, 1 Strange 505, 93 Eng.Rep. 664 (1722), as having an important bearing on issues of damages under the Securities Exchange Act, due, no doubt, to Judge L. Hand's resurrection of the case in an action under § 16(b), Gratz v. Claughton, 187 F.2d 46, 51–52 (2 Cir.), cert. denied, 341 U.S. 920, 71 S.Ct. 741, 95 L.Ed. 1353 (1951), it may not be amiss to add that this old decision had nothing to do with fluctuating values. The Chief Justice simply "directed the jury, that unless the defendant did produce the jewel, and shew it not to be of the finest water, they should presume the strongest against him, and make the value of the best jewels the measure of their damages."

27. Section 151, comment c, of the Restatement of Restitution, cited both in *Janigan* and in Myzel v. Fields, *supra,* 386 F.2d at 743 n.19, limits recovery to "the highest value reached by the subject matter within a reasonable time after the tortious conduct." If the fraud is such that it could not reasonably be discovered until a later date, the rule is that recovery is limited to the highest value reached within a reasonable time after that date. See, e. g., Baumel v. Rosen, *supra,* 412 F.2d at 576. The reason for this, in the case of marketable securities, is obvious. Once the seller has discovered the fraud, he can protect against further damage by replacing the securities and should not be allowed to profit from a further appreciation, while being protected against depreciation by his right to recover at least the difference in value at the time of his sale. Similar considerations support the general rule that a defrauded seller must act within a reasonable time after discovery of the fraud if he wants to rescind the transaction, and will otherwise be limited to damages. See, e. g., Myzel v. Fields, *supra,* 386 F.2d at 740–741 n. 15; Baumel v. Rosen, *supra,* 412 F.2d at 574–575. While these doctrines may not be precisely applicable here, they demonstrate the general recognition of the unfairness to defendants of undue prolongation of the period for calculating damages.

28. It is worth noting that the court in *Janigan* pointed out that the profits awarded to plaintiff there were "the proximate consequence of the fraud." 344 F.2d at 786.

the merger of the assets Skogmo received from GOA which remained unsold at the date of judgment plus the net proceeds of the plant sales, and added interest to the date of judgment at the approximately 7% rate fixed by the New York State Banking Board, whether that was what Skogmo earned or not. He then deducted the value of what the GOA minority stockholders received plus dividends and 5% interest on such dividends to the date of judgment,[29] whether they had kept the Skogmo preferred stock or not [30] and without regard to the fact that, because of the conversion feature, GOA stockholders who retained the stock, in addition to receiving dividends, in effect shared in the growth in retained earnings of Skogmo.

■ Under the circumstances of this case, this computation, resulting in an effective interest rate of approximately 9½% on the difference between what the minority stockholders gave up and what they received, was too severe. Although, as noted, Justice Harlan's suggestion in *Mills*, 396 U.S. at 389, 90 S. Ct. at 624, that "relief might be predicated on a determination of the fairness of the terms of the merger at the time it was approved," dealt with a defect in a proxy statement not relating to the terms, we see no reason why it should not be applicable here, as indeed the judge thought except in the interest/dividends computation. The merger was unfair and the plaintiffs were damaged only to the extent that the value of their share of the assets given up by GOA exceeded the value of the preferred stock they received. It is on this net difference that the district judge should have computed the pre-

judgment interest at the rates on which he settled, those established by the New York State Banking Board. Prejudgment interest at the higher effective rate resulting from the district judge's method of computation might well exceed the appropriate limits of such an award as set out by this court in Norte & Co. v. Huffines, 416 F.2d 1189 (2 Cir. 1969), cert. denied, 397 U.S. 989, 90 S. Ct. 1121, 25 L.Ed.2d 396 (1970).

■ Our ruling favorable to the defendant on this point requires, however, a readjustment adverse to it on another, of considerably less importance. The judge began the running of interest with respect to the profits realized on the plant sales only from their respective dates. If, as we ·hold, the proper base for computing interest is the excess of the value of GOA's assets at the date of the merger over the value of the Skogmo convertible preferred, plaintiffs should not be denied interest on the excess of the value of the unsold plants at the date of the merger over their book value in the period before their sale. Nothing in the record suggests that the then value of these plants was less than the net amounts at which they were sold within nine months thereafter.

Skogmo also objects to the judge's direction that the special master not receive certain evidence with respect to the value of the Stedman shares. GOA had purchased these on December 28, 1962, for $20 a share, at a total cost of $22,459,391. Plaintiffs asserted that, as of the date of the merger, the shares were worth much more. Skogmo sought to counter this by offering proof that it had overpaid because of its need to make some such purchase in order not to be-

29. See note 8 *supra*. Apparently the counsel who represented Skogmo at trial had first agreed to the 5% figure during the hearings before the Special Master, see 348 F.Supp. at 983 n. 1, although not to the judge's general theory of handling interest. The judge's third opinion, 348 F. Supp. at 987, manifested justifiable irritation at the constant changes of position by Skogmo's trial counsel and, to a lesser extent, at "the unreasonable, exaggerated and unsupportable claims asserted by the plaintiffs."

30. As against the assigned valuation of 37 as of the date of the merger, which we find to have ample support in the record despite the plaintiffs' objections, the stock had sold as high as 49½ and as low as 22⅛ between its issuance and the end of 1971. 1 Moody's Industrial Manual a108 (1972).

come an investment company.[31] But the judge instructed the special master not to receive such evidence on the second reference, unless the evidence would show a decrease in value between May 1963, when Skogmo had prepared the Proxy Statement carrying Stedman at its purchase price, and October 17, 1963. None was offered; indeed, the master found that the value had increased and arrived at a figure of $24,250,000.

While it might have done no harm to have allowed Skogmo to make the attempt, we are not disposed to require *any modification of the judgment on this account.* It does not sit very well for Skogmo to assert that the Stedman stock was not worth the money it had caused GOA to °spend in its purchase less than a year before. Beyond this, we are convinced that even if the exclusion were error, it would have been harmless. A bid by GOA of $17.50 per share on November 30, 1972, had met with only trifling acceptance. There were rumors in late 1962, whether having a substantial basis or not, that F. W. Woolworth & Co. was about to make an offer of $22 per share. An expert witness for the defendant had testified at the trial before the judge that, on the date of the merger, the Stedman stock was worth $22,459,000. The special master was convinced that Gamble regarded Stedman as an exceptional opportunity, because of the company's intrinsic merit and the further gains realizable from modernization and association with Skogmo's management and the McLeod chain. He also concluded on the basis of Gamble's testimony that it was this exceptional opportunity rather than the Investment Company Act problem which was the prime motivation for the purchase, and that the price was fair. Moreover, it was conceded by all concerned that the value of Stedman had in-

creased between the purchase and the merger. We are thus convinced that if the special master had been allowed to receive the evidence proffered to show that the Stedman shares were not worth what GOA had paid in December 1962, his conclusion would not have been altered.

With respect to plaintiffs' other criticisms of the special master's report, we are content to rest on the third opinion of Judge Bartels, 348 F.Supp. at 984–987. However, plaintiffs raise another question relating to the amount of recovery which has potentially great importance in securities litigation. They refer to the district court's second opinion, 332 F.Supp. at 649, where the judge, after criticizing counsel on both sides for time-consuming tactics before the special master, stated:

> All these matters will later be given adequate consideration and will be reflected in the ultimate allocation of allowances and costs.

They indicate that the judge has in mind charging at least a portion of plaintiffs' counsel fees and expenses *directly against Skogmo* rather than providing for their payment out of the fund recovered for GOA's minority stockholders and that he desires our views concerning his power to do so.

The argument that a court has power to do this in an appropriate case under the securities laws seems at first glance to gain some support from Part IV of the opinion in *Mills,* 396 U.S. at 389–397, 90 S.Ct. 616. If a court can direct a defendant to pay counsel fees and expenses to a successful plaintiff in an action under Rule 14a–9(a) once liability is established, even when there might not be a monetary recovery, as was there held, why can it not direct that at least so much of counsel fees and expenses as were incurred in establishing

---

31. During October 1962 the Stedman shares were traded at prices ranging between 11 and 12⅜. While the monthly high rose to 17 in November, this no doubt reflected Bertin C. Gamble's public offer on the last day of the month to purchase tendered shares at $17.50. The price rose as high as 20⅛ in December, but again this was very likely due to Gamble's further public offer to purchase shares at $20.

liability shall be paid by the defendant even when a fund has been recovered? However, the Court in *Mills* went to some pains to point out that charging the attorneys' fees to the surviving corporation was "not to saddle the unsuccessful party with the expenses but to impose them on the class that has benefited from them and that would have had to pay them had it brought the suit," 396 U.S. at 396–397, 90 S.Ct. at ⁻628. In other words, if the merged corporation, there Electric Auto-Lite, had done what it should have done, it would have had to pay counsel fees and expenses even though no fund was recovered, and due regard for the "therapeutic" effect of a derivative suit in effecting compliance with § 14(a) and the proxy rules required that the plaintiff stockholders should not have to bear that burden if, although they had established liability, they should be unable to establish damages. In contrast, when the action produces damages sufficient for counsel fees and expenses,[32] payment of these from the fund imposes no burden on the stockholders who had taken the initiative, as distinguished from the entire class. We are thus unwilling to extrapolate from *Mills*, whose limits remain to be worked out even in the situation to which it was specifically directed, see The Supreme Court, 1969 Term, 84 Harv.L.Rev. 1, 215–18 (1970); Note, The Allocation of Attorney's Fees After Mills v. Electric Auto-Lite Co., 38 U. Chi.L.Rev. 316 (1971), a principle that would depart so radically and unnecessarily from traditional notions with respect to the award of counsel fees and expenses in derivative and class litigation in a situation where an ample fund has been generated.[33]

This is not to say, however, that if a defendant in an action under § 14(a) has engaged in dilatory tactics, the district court would be without power to require it to pay for additional expenses it has caused plaintiff to bear. Federal courts have long possessed the equitable power to award counsel fees when justice requires. Sprague v. Ticonic National Bank, 307 U.S. 161, 164–165, 59 S.Ct. 777, 83 L.Ed. 1184 (1939); Vaughan v. Atkinson, 369 U.S. 527, 530, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962). This power has been used to award counsel fees to successful parties when their adversaries have acted vexatiously or in bad faith. See, *e. g.*, Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 402 n.4, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968); Local No. 149, UAW v. American Brake Shoe Co., 298 F.2d 212 (4 Cir.), cert. denied, 369 U.S. 873, 82 S.Ct. 1142, 8 L.Ed.2d 276 (1962), and cases there cited; Bell v. School Board, 321 F.2d 494, 500 (4 Cir. 1963) (en banc); Alland v. Consumer Credit Corp., 476 F. 2d 951, 957 (2 Cir. 1973). Assessment of counsel fees under such circumstances in no way conflicts with the primary justification for the rule against the shifting of counsel fees, namely, that the defendant should not be discouraged from fairly contesting the plaintiff's claims. Whether this case is appropriate for such limited relief will be for

---

32. It should be noted that the present action was a class action on behalf of the stockholders of GOA other than Skogmo and that the latter does not share in the recovery.

33. Drawing our attention to § 11(e) of the Securities Act of 1933, plaintiffs urge that the Proxy Statement here was the functional equivalent of a registration statement so that the provisions of § 11(e) for the discretionary award "of the costs of such suit, including reasonable attorney's fees" would be applicable. While we have agreed that, for purposes of determining the required culpability, the Proxy Statement here at issue bears a strong resemblance to a registration statement, § 11(e) is not so readily expanded. Moreover, it allows an award only when "the court believes the suit or the defense to have been without merit." This means a defense bordering on frivolity, not simply one that is unsuccessful. Can-Am Petroleum Co. v. Beck, 331 F.2d 371 (10 Cir. 1964); Klein v. Shields & Co., 470 F.2d 1344 (2 Cir. 1972). Since the defense here clearly did not border on frivolity, the supposed analogy to § 11(e) thus would work against plaintiffs rather than for them.

Judge Bartels to determine in the first instance.

We therefore direct the district court to modify its judgment so that plaintiffs will receive pre-judgment interest, at the rates for various periods determined by the district court, only on the excess of the value of their share of the assets of GOA [34] over the value of the convertible preferred stock of Skogmo from October 17, 1963, to the date of judgment. As so modified, the judgment will stand affirmed. Costs are to be equally divided.

OAKES, Circuit Judge (concurring):

I concur in Chief Judge Friendly's lucid and perceptive opinion without any reservations, save one.

It seems to me that our remand on the subject of attorneys' fees should be broader in scope. The majority opinion would limit the district court to awarding attorneys' fees only if in the exercise of its equitable powers it found that Gamble-Skogmo, Inc., had acted "vexatiously or in bad faith." *Cf.* Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 402 n. 4, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968). I read Mills v. Electric Auto-Lite Co., 396 U.S. 375, 389–397, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), somewhat more broadly. *Mills,* of course, did hold that no pecuniary benefit need be demonstrated for the award of attorneys' fees when the judgment results in a "common fund" for the plaintiffs or for their class, thereby extending Sprague v. Ticonic Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939).

With the majority's views on this point I do not quarrel.

It sems to me, however, that *Mills* went beyond this to say that the court has power in a § 14(a) suit to award attorneys' fees "when circumstances make such an award appropriate . . . ." 396 U.S. at 390–391, 90 S.Ct. at 625. In the course of the *Mills* opinion the Court went on to say that

> Nevertheless, the stress placed by Congress on the importance of fair and informed corporate suffrage leads to the conclusion that, in vindicating the statutory policy, petitioners have rendered a substantial service to the corporation and its shareholders.

396 U.S. at 396.[1] This, it seems to me, gives a somewhat new and different basis for the awarding of attorneys' fees in an appropriate case—namely, that the plaintiffs have in effect enforced an important congressional objective and as it has sometimes been put have acted as "private attorneys general" in effectuating that policy. On this basis in any event attorneys' fees have been awarded in civil rights cases,[2] a Labor Management Reporting and Disclosure Act of 1959 case,[3] and more recently in an environmental case.[4]

The effectuation of congressional policy as a separate rationale for the award of attorneys' fees would seem to me to give the district court here some greater leeway for the making of such an award in this instance than would the majority opinion. It may be that the recovery of a substantial fund from which attorneys'

---

34. Such values will be the sum of the net sales prices of the plants unsold at the date of the merger and the figures determined by the Special Master for all other assets.

1. It can be argued that this sentence was wholly in the context of cases in which "it may be impossible to assign monetary value to the benefit." That, at least, is the subject to which the sentence immediately preceding the "Nevertheless" sentence quoted in the body of this opinion relates. Presumably, the majority would so confine this language as a matter of law. I prefer

to think that *Mills* leaves the question open.

2. *E. g.,* Lee v. Southern Home Sites Corp., 444 F.2d 143 (5th Cir. 1971) (Wisdom, J.); NAACP v. Allen, 340 F.Supp. 703 (M.D.Ala.1972) (Johnson, J.). *See also* Newman v. Piggie Park Enterprises, Inc., *supra.*

3. Yablonski v. United Mine Workers, 466 F.2d 424 (D.C.Cir.1972).

4. LaRaza Unida v. Volpe, 57 F.R.D. 94 (N.D.Cal., Oct. 19, 1972) (Peckham, J.).

fees can be paid would, as the majority here would have it, preclude as a matter of law the awarding of attorneys' fees even where the strong congressional policy underlying § 14(a) was effectuated only by the litigation in issue. I would prefer to see the issue of attorneys' fees decided only after further findings, since those findings are going to be necessary in any event, even on the basis of the limited remand of the majority opinion.