NORTHWAY, INC., a Delaware
Corporation, Plaintiff-Appellant,

v.

TSC INDUSTRIES, INC., a Delaware
Corporation, et al.,
Defendants-Appellees.

No. 73–1922.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 12, 1974.

Decided March 5, 1975.

Arnold I. Shure, Stanley B. Block, Willard J. Lassers, Harry B. Reese, Chicago, Ill., for plaintiff-appellant.

Barry B. Nekritz, Chicago, Ill., for intervenors.

Joseph N. Morency, Jr., Jerald P. Esrick, Chicago, Ill., Robert B. Fiske, Jr., New York City, for defendants-appellees.

Before SWYGERT, CUMMINGS and PELL, Circuit Judges.

SWYGERT, Circuit Judge.

This appeal concerns violations of Rules 14a–3 and 14a–9 issued by the Securities Exchange Commission pursuant to section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a). This section makes it unlawful for any person to solicit by mail or other means of interstate commerce proxies of a registered security in violation of rules promulgated by the Commission pursuant to the statute. The appeal also concerns alleged violations of section 78j(b) of the Securities Exchange Act of 1934 and Rule 10b–5 thereunder.

Plaintiff Northway, Inc. brought this action against defendants National Industries, Inc. and TSC Industries, Inc. for alleged violations of section 14(a) in connection with the acquisition of TSC by National in a stock-for-stock purchase. Northway alleges that these corporate defendants issued a joint proxy statement in connection with a takeover, which statement was incomplete and materially misleading. In addition, Northway brought suit against Charles E. Schmidt and various members of his family alleging that these defendants also violated the Securities and Exchange Act by selling their controlling interest in TSC without adequately protecting the interests of its other shareholders. The Schmidt defendants were also charged with aiding and abetting the corporate defendants. Northway appeals from orders of the district court denying its motion for summary judgment on the issue of liability of the corporate defendants, denying its similar motion as to the Schmidt defendants, and granting a cross-motion for summary judgment filed by the Schmidt defendants. Appeal is taken by leave pursuant to 28 U.S.C. § 1292(b), the district court and this court having found that the disposition of these motions involves controlling and important questions of law as to which there is substantial ground for difference of opinion, and that immediate appeal may materially advance the ultimate termination of this litigation. We affirm the granting of summary judgment for the Schmidt defendants, but reverse the denial of summary judgment as to the liability of the corporate defendants.

I

Plaintiff Northway is a Delaware corporation doing business in Illinois, where it maintains its principal place of business. In January and February of 1969 Northway owned 200 shares of Common Stock in TSC Industries, also a Delaware corporation. Northway continued to own the TSC stock throughout the period of the transactions challenged in this lawsuit.

As of January 16, 1969 Charles E. Schmidt, Sr. and various members of his family owned approximately one third of the outstanding voting shares in TSC.[1] In addition, Mr. Schmidt and his son, Charles E. Schmidt, Jr., were members of the TSC board of directors. On that day, Mr. Schmidt was approached by representatives of National Industries, Inc., a Kentucky corporation, who inquired into the possibility of acquiring all of the Schmidt family interest in TSC.[2] After reviewing his own financial position and after an evaluation of National Industries and its key personnel,

1. Mr. Charles E. Schmidt, Sr. owned 411,703 shares of TSC Common Stock and 338,974 shares of its Preferred Stock. A residue of 16,137 Common shares and 100,601 Preferred shares was owned in various proportions by Dorothy F. Schmidt, Richard L. Schmidt, Charles E. Schmidt, Jr. and the Charles E. Schmidt and Dorothy F. Schmidt Family Foundation.

2. The meeting with the National representatives had been arranged by Mr. Schmidt's neighbor, Mr. Frank Cryan, without Mr. Schmidt's knowledge or prior consent. Mr. Schmidt was informed that the meeting had been arranged on the morning of the 16th.

Mr. Schmidt determined that he would move ahead with the sale. On January 30, 1969 a stock purchase agreement was signed. Under the agreement, the Schmidt defendants were to receive substantially the then market value for their TSC securities. Payment was to be in cash and National's 5% notes payable in six annual installments.[3] Immediately after signing the agreement Mr. Schmidt tendered his resignation from the board of directors of TSC. Mr. Schmidt's son, Charles E. Schmidt, Jr., tendered his resignation from the TSC board of directors on February 7, 1969, the date of closing of the stock transfer. The Schmidt defendants had no further contact with TSC or National after February 7, 1969.

Shortly after the acquisition of the Schmidt interests, on March 31, 1969, four National nominees were elected to the ten-man board of directors of TSC.[4] On that same day, Stanley R. Yarmuth, president and chief executive officer of National, became the chairman of the TSC board of directors and Charles F. Simonelli, executive vice president of National, became chairman of the TSC executive committee.

On October 16, 1969, a proposal to liquidate and dissolve TSC and to sell all its assets to National was considered at a meeting of the TSC board of directors. Under the proposal National was to acquire all TSC assets in return for Na-

tional securities. Eight members of the TSC board of directors attended this meeting.[5] The proposition received the affirmative votes of four non-National directors. The three National nominees on the TSC board attending the meeting abstained from voting on the advice of their attorneys. One non-National director also abstained.

On November 12, 1969, TSC and National issued a joint proxy statement to the shareholders of TSC concerning the proposed liquidation and sale. The statement urged TSC shareholders to approve the transaction. Sufficient proxies were received and voted in favor of the proposal to cause it to be approved. TSC was placed in liquidation and dissolution and notices were sent to all TSC stockholders advising them that they were required to exchange their TSC shares for National securities. Shares were exchanged and the transaction completed.

## II

Corporate defendants National Industries, Inc., and TSC, Inc. are charged with violations of § 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a),[6] and Rules 14a–3 and 14a–9 thereunder.[7] The 14a–3 claim is based on the failure of the corporate defendants to include in the joint proxy statement the conclusion that a change in

---

**3.** National agreed to pay $30 per share for the Common Stock and $22.50 per share for the Preferred. A cash payment of 25% was agreed to, with the balance payable in five annual installments of 10% of the *total* price and a sixth installment of the remaining 25% in the sixth year. In consideration of the low interest rate of 5% on the deferred notes, National gave the Schmidts 125,000 Warrants for the purchase of National Common Stock at $24 per share exercisable during the one year period between February 7, 1974 and February 7, 1975.

**4.** The four National nominees were Mr. Stanley R. Yarmuth, president and a director of National, Mr. Charles F. Simonelli, executive vice-president and a director of National, Mr. Allan B. Solomon, vice-president of National, and Mr. Hyman Ullner, of Cincinnati, Ohio. Subsequently, Mr. Jack Segell, president of G*E*S Stores, Inc., a subsidiary of National, was elected to the TSC board.

**5.** Attending were National nominees Messrs. Yarmuth, Solomon and Segell, and non-National board members Max J. DeForest, Blanke Noyes, Orville E. Peterson, Richard H. Schaefer and Carl W. Scharfman.

**6.** § 14(a) provides:

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

**7.** 17 C.F.R. § 240.14a–3; 17 C.F.R. § 240.14a–9.

control of TSC had taken place as a result of the transfer of the Schmidt interests in TSC to National.[8] The 14a–9 claim is based on the failure of the corporate defendants to include certain material information in the joint proxy statement concerning the degree of potential influence of defendant National in the management of TSC, the favorability of the terms of the National acquisition proposal to the TSC shareholders, and the formal approval by the TSC board of directors of the resolution of liquidation and dissolution.[9]

■ We agree with the district court that the issue of control is a factual issue presently in dispute and that summary judgment as to the Rule 14a–3 claim would have been inappropriate. The essence of the 14a–3 claim is that the proxy statement failed to disclose, in accordance with Schedule 14A, that a change of control of TSC had taken place during the preceding fiscal year. Each side has presented exhibits and affidavits tending to support their conflicting views on the control issue. The trial court properly denied Northway's motion in the face of this bona fide dispute.

■ Plaintiff's Rule 14a–9 motion for summary judgment is quite different from the 14a–3 motion. The central question under Rule 14a–9 is whether, considering all of the circumstances which existed at the time the joint proxy statement was issued, the proxy statement was false or misleading in its presentation of a material fact or in its failure to include such a fact. Northway contends that the statement was misleading because of five omissions of fact, all of which it says were material. To prevail on the 14a–9 issue Northway must establish undisputed facts sufficient to show that one or more of the omitted items is material as a matter of law. To do this, it must demonstrate that reasonable minds could not differ on the question of materiality. Johns Hopkins University v. Hutton, 422 F.2d 1124, 1129 (4th Cir. 1970); Beatty v. Bright, 318 F.Supp. 169, 173 (S.D.Iowa 1970); Berman v. Thompson, 312 F.Supp. 1031, 1034 (N.D.Ill.1970).

In Mills v. Electric Autolite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), the Supreme Court addressed itself to the elements of a cause of action brought under Rule 14a–9. The Court held that once materiality is established, specific proof of causation is unnecessary providing it is shown that the proxy statement itself was an essential link in the transaction. The Court thus recognized that the concept of materiality is itself defined in terms of potential causative effects.[10]

---

**8.** Rule 14a–3(a) provides that:

No solicitation subject to this regulation shall be made unless each person solicited is concurrently furnished or has previously been furnished with a written proxy statement containing the information specified in Schedule 14A.

Schedule 14A, Item 5, requires:

(e) If to the knowledge of the persons on whose behalf the solicitation is made a change in control of the issuer has occurred since the beginning of the last fiscal year, state the name of the person or persons who acquired such control, the basis of such control, the date and a description of the transaction or transactions in which control was acquired and the percentage of voting securities of the issuer now owned by such person or persons.

**9.** Rule 14a–9 provides:

(a) No solicitation subject to this regulation shall be made by means of any proxy statement, notice of meetings or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

**10.** The pertinent language is:

Where the misstatement or omission in a proxy statement has been shown to be "material," as it was found to be here, that determination itself indubitably embodies a conclusion that the defect was of such a character that it might have been considered important by a reasonable shareholder who was in the process of deciding

Since *Mills*, some uncertainty has developed as to which language in that opinion represents the proper test to apply in determining the materiality of an omitted fact. Different results could flow from a test requiring only that the omitted fact "might have been considered important by a reasonable shareholder who was in the process of deciding how to vote" than would flow from a test requiring that the fact have "a significant *propensity* to affect the voting process." [11] On a motion for summary judgment, the "might have" test would ask whether a reasonable mind could conclude that the omitted fact is so irrelevant that it would never reasonably be considered important. The "significant propensity" test would ask whether a reasonable mind could conclude that the fact is less than significant in its potential to affect the voting process. Many facts which are relevant within the first test could reasonably be said to have less than a significant propensity to affect the voting process taken as a whole, even though for some few stockholders these same facts could be determinative.

■ We believe the policies which underlie § 14(a) and Rule 14a–9 are best served by a test that includes all facts which a reasonable stockholder might consider important. We are mindful of Judge Friendly's thorough consideration of this question and of the criticism that such a test is "too suggestive of a mere possibility, however unlikely." Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281, 1302 (2d Cir. 1973). Yet we think any test which does not require the inclusion of facts which *could* influence a reasonable stockholder would seriously undercut the intended prophylactic effect of these disclosure provisions. Any speculation under such a test is limited by the "rea-

---

how to vote. This requirement that the defect have a significant *propensity* to affect the voting process is found in the express terms of Rule 14a–9, and it adequately serves the purpose of ensuring that a cause of action cannot be established by proof of a defect so trivial, or so unrelated to the transaction for which approval is sought, that correction of the defect or imposition of liability would not further the interests protected by § 14(a).

There is no need to supplement this requirement, as did the Court of Appeals, with a requirement of proof of whether the defect actually had a decisive effect on the voting. Where there has been a finding of materiality, a shareholder has made a sufficient showing of casual relationship between the violation and the injury for which he seeks redress if, as here, he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction. This objective test will avoid the impracticalities of determining how many votes were affected, and, by resolving doubts in favor of those the statute is designed to protect, will effectuate the congressional policy of ensuring that the shareholders are able to make an informed choice when they are consulted on corporate transactions. 396 U.S. at 384–85, 90 S.Ct. at 622.

11. The district judge twice stated the burden of plaintiffs in this case in terms of the "might have been considered important" test:

To establish a violation [of Rule 14a–9], plaintiff must prove . . . (b) that the misstatement or omissions were material in the sense that they "might have been considered important by a reasonable shareholder who was in the process of deciding how to vote." . . .

The pivotal question as to plaintiff's motion for summary judgment on this ground is thus whether certain facts relating to the relationship between TSC and National which were omitted from the joint proxy statement were, as a matter of law, material. To meet its burden, plaintiff must show that the facts withheld were so obviously important to TSC shareholders that reasonable minds could not differ on the question of whether the shareholders might have considered them important. 361 F.Supp. at 111–12.

But in denying plaintiff's motion for summary judgment, he specifically relied on the stricter, "significant propensity" test:

While the Court believes that the prior claims of control made to the SEC and Yarmuth's and Simonelli's other positions might have been considered important by TSC shareholders, it cannot conclude that these facts were so obviously important that reasonable minds could not differ on the issue; that is, as to whether they would have a significant propensity to affect the voting process. 361 F.Supp. at 114.

sonable stockholder" language therein and by the overriding purposes of § 14(a),[12] from which any test must take its meaning and to which Justice Harlan specifically referred in *Mills*. This test will not reach "trivial" and "unrelated" facts; neither will it fail to reach facts which may be relevant for some, but not for others.

We are convinced that the test we adopt is supported by the reasoning of the Supreme Court in *Mills* and in *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). These cases held that proof of causation or actual reliance is unnecessary to establish liability under Rules 14a–9 and 10b–5 in connection with a failure to disclose, and that causation is established once it is shown that the facts in question might have been considered important by a reasonable stockholder. It would make little sense to hold that causation is established by a more lenient standard than materiality. In fact any test of materiality which requires a finding of some probability that the omitted fact would affect the voting process necessitates the same difficult proofs the Supreme Court sought to avoid by eliminating the need for independent proof of causation or reliance.[13]

Finally, we cannot agree with the argument that the Supreme Court has twice included the "might have" test without specific consideration of the materiality issue itself. See *Gerstle v. Gamble-Skogmo, Inc., supra*, 478 F.2d at 1301–02 and n. 21; *Smallwood v. Pearl*

12. The Court has said that the 1934 Act and its companion legislative enactments embrace a "fundamental purpose . . . to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972).

13. While Judge Friendly saw the distinction between "would" and "might" as small, perhaps even "gossamer," *Gerstle, supra*, 478 F.2d at 1302, we believe that *Mills* and *Ute* preclude such an analysis. Once the element of probability becomes a part of the materiality test, a mere showing of relevancy of omitted facts is inadequate to establish a violation of 14a–9 or 10b–5. Under a probability test, we cannot see how the plaintiff would prevail without introducing some evidence, direct or indirect, tending to show that the challenged omission had an actual impact in his case. If there is a distinction, in the trial context, between proofs which show that a particular omission would have been relied upon, and those which show that the omission was in fact relied upon, it is so subtle as to have no practical significance. We believe that relevancy alone is the critical test of materiality and that when relevant facts are withheld from a proxy solicitation, materiality is established independent of any proofs of probable reliance or causation.

It is interesting to note that Judge Friendly cites List v. Fashion Park, Inc., 340 F.2d 457 462 (2d Cir. 1965), cert. denied, 382 U.S. 811 86 S.Ct. 23, 15 L.Ed.2d 60 (1965) and SEC v Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir

1968), cert. denied, sub-nom. Coates v. Securities and Exchange Commission, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969) in support of the probability test. Neither case is absolutely clear on the precise test of materiality. In *List*, although the court quotes the Restatement of Torts § 538(2)(a) to the effect that material facts are those to which "a reasonable man *would* attach importance" (emphasis added), it also quotes with approval this court's holding in Kohler v. Kohler Co., 319 F.2d 634 (7th Cir. 1963) that material facts include those facts "which in reasonable and objective contemplation *might* affect the value of the corporation's stock or securities." *Id.* at 642. In *Texas Gulf Sulphur, both* tests approved in *List* are quoted, and the court further holds that

material facts include not only information disclosing the earnings and distributions of a company but also those facts which affect the probable future of the company and those which *may* affect the desire of investors to buy, sell, or hold the company's securities. 401 F.2d at 849. (emphasis added)

Indeed, Judge Friendly himself used a "mixed" test in General Time Corp. v. Talley Industries, Inc., 403 F.2d 159 (2d Cir. 1968), cert. denied, 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969):

The test, we suppose, is whether, taking a properly realistic view, there is a substantial likelihood that the misstatement or omission *may* have led a stockholder to grant a proxy to the solicitor or to withhold one from the other side, whereas in the absence of this he would have taken a contrary course. *Id.* at 162. (emphasis added)

Brewing Company, 489 F.2d 579, 604 (5th Cir. 1974). Had Justice Blackmun intended to leave the definition of materiality open in *Ute*, he could have done so. He chose not to, but instead adopted the essence of the *Mills* test:

> [D]efendants devised a plan and induced the mixed-blood holders of UDC stock to dispose of their shares without disclosing to them material facts which could have been expected to influence their decisions to sell. . .
>
> Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. 406 U.S. at 153–54, 92 S.Ct. at 1472.

This is entirely consistent with the purposes of disclosure requirements and with the policy of "resolving doubts in favor of those the statute is designed to protect." Mills v. Electric Autolite Co., 396 U.S. at 385, 90 S.Ct. at 622.

■ Having concluded that the proper test of materiality is whether the omitted fact is "of such a character that it might have been considered important by a reasonable shareholder who was in the process of determining how to vote," *Id.* at 384, 90 S.Ct. at 621, we consider the five separate facts omitted from the joint proxy statement in this case.

### A

Northway's initial charge is that the joint proxy statement failed to disclose two material facts related to the question of National's potential influence over the management of TSC. Specifically, the proxy failed to show that both TSC and National had filed special reports with the Securities Exchange Commission indicating that the transfer of the Schmidt interests had resulted in a change in control of TSC and that National could be deemed the "parent" of TSC as a result of that transfer.[14] The statement also failed to show that at the time the TSC board of directors considered the proposed merger transaction and at the time the joint statement was

---

**14.** In connection with the acquisition of the Schmidt interests by National, both National and TSC filed special reports with the SEC in compliance with the Securities Exchange Act of 1934. National filed a Schedule 13D in compliance with § 13(d) of the Act, 15 U.S.C. § 78m(d). Item four in that schedule requires that if the *purpose of the acquisition is to acquire control* of the business of the issuer, any plans or proposals of the acquiring party to make major changes in that business must be disclosed. In response to that item, National stated in part:

> National has acquired approximately 33% of the outstanding voting shares of TSC, Inc. Accordingly, National may be deemed to be a "parent" of TSC as that item is defined in the Rules and Regulations under the Securities Act of 1933.

TSC filed Forms 110–K and 8–K in compliance with section 15(d) of the Act, 15 U.S.C. § 78*o* . The Form 10-K, at Item 3(a), contained language identical to that found in National's 13D filing indicating that National could be deemed to be the "parent" of TSC. The Form 8-K, at Item 1, entitled "Changes in Control of Registrant," contained a reference back to the "parent" language in Form 10-K.

The definition of the term "parent" is found at S.E.C. Rule 12b-2(a), (f), (k), 17 C.F.R. § 240.12b-2(a), (f), (k):

> Unless the context otherwise requires, the following terms, when used in the rules contained in this regulation or in Regulation 13A or 15D or in the forms for applications, statements and reports filed pursuant to Section 12, 13 or 15(d) of the Act, shall have the respective meanings indicated in this rule:
>
> (a) *Affiliate.* An "affiliate" of, or a person "affiliated" with, a specified person, is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified.
>
> (f) *Control.* The term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.
>
> (k) *Parent.* A "parent" of a specified person is an affiliate controlling such person directly, or indirectly through one or more intermediaries.

issued, the chairman of the TSC board of directors was Stanley Yarmuth, National's president and chief executive officer, and the chairman of the TSC executive committee was Charles Simonelli, National's executive vice president.

■ Northway contends that failure to include these facts was misleading since TSC stockholders were relying on the TSC board of directors to negotiate on their behalf for the best possible rate of exchange with National. Because these facts were persuasive indicators that the TSC board was in fact under the control of National, and that National thus "sat on both sides of the table" in setting the terms of the exchange, Northway says these facts were material to a decision whether or not to approve the terms of the transaction as a matter of law. We agree.

■ While the proxy statement did indicate that five of the ten positions on the TSC board of directors were held by nominees of National and that National held a substantial equity position in TSC amounting to thirty-four percent of outstanding voting securities, this did not render the additional information bearing on National's influence over TSC merely cumulative or trivial. Indeed, there is a vast difference between the picture presented by these facts alone and the picture which would have resulted from the addition of the facts that National nominees occupied the chairmanships of both the board of directors and the executive committee of TSC and that even before the National nominees became TSC board members, both National and TSC thought it necessary to inform the Securities Exchange Commission that National could be deemed to be in control of TSC.[15] The picture presented in the joint proxy statement may well have indicated to "those aware of [the] corporate mechanism," Mills v. Electric Autolite Company, 403 F.2d 429, 433 (7th Cir. 1968), rev'd on other grounds, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593

(1970), that National was in a position to exert considerable influence over TSC, but all stockholders, unsophisticated and sophisticated alike, were entitled to the full picture: that a substantial likelihood existed that National's influence in fact amounted to control.

■ We hold that failure to disclose the prior filings with the Securities Exchange Commission and the failure to disclose the crucial positions held by National nominees Yarmuth and Simonelli on the TSC board of directors were materially misleading within the meaning of § 14(a) of the Securities Exchange Act of 1934 and Rule 14a–9 thereunder as a matter of law. The order of the district court denying summary judgment against the corporate defendants on the issue of liability must therefore be reversed on this ground alone.

### B

■ Northway further contends that the proxy statement was materially misleading in its failure to disclose two sets of facts relating to the favorability of the terms of the proposed merger transaction to TSC shareholders. The first omission involves a series of acquisitions of National Industries Common Stock by National and by Madison Fund, Inc., a large mutual fund, during the two years immediately preceding the issuance of the proxy statement. The second omission involves a reference in the statement to an opinion letter from Hornblower & Weeks-Hemphill, Noyes indicating their favorable evaluation of the proposed transaction, when no similar reference was made to a subsequent letter from that firm which more particularly described the basis for the original opinion and indicated that Hornblower expected the market value of the National Warrants being offered to decline substantially prior to the proposed exchange. We hold that these omissions were also material and in violation of Rule 14a–9.

15. National filed its Schedule 13D on February 14, 1969. TSC filed its Form 10–K on February 27, 1969 and its Form 8–K on March 7, 1969. The election of officers of the TSC board of directors took place on March 31, 1969.

The joint proxy statement contained a major section entitled "Proposed Agreement to Sell TSC's Assets to National and Liquidation and Dissolution of TSC." The first information which appeared in this section concerned the approval of the proposed agreement by the boards of directors of National and TSC. The shareholders were told that the boards of directors of both corporations believed the proposal to be in the best interests of their shareholders, based in part on "recent market prices of the securities of the two corporations." The shareholders were also informed of the favorable opinion of the Hornblower firm regarding the fairness of the transaction to the stockholders of TSC. Current market values of the securities involved were listed as one of the bases for the Hornblower opinion, with specific reference to a "substantial premium over current market values represented by the securities being offered to TSC stockholders." [16]

Following this information the terms of the proposed exchange were set out. According to those terms holders of TSC Series 1 Preferred Stock were to receive .6 share of National Series B Preferred Stock and one National Warrant for each of their shares. Each holder of TSC Common Stock was to receive .5 share of National Series B Preferred Stock and 1.5 National Warrants for each of his shares. One of the characteristics of National Series B Preferred was that each such share would be convertible into National Common Stock. Each National Warrant entitled its holder to purchase one share of National Common at $21.40 per share until October 31, 1978.

By linking the evaluation of the proposed exchange to current market values, the proxy statement invited shareholders to rely on a table of market values which appeared three pages later in that statement. The table included market prices of all of the securities involved in the proposed exchange for 1967, 1968 and 1969 up to November 7, 1969; the closing prices on November 7 were set out separately at the bottom of the same page. [17] By using simple arithmetic, any TSC shareholder could thus determine the apparent premium which would result from the proposed rates of exchange based on the latest market figures. Based on these simple calculations, the premiums disclosed were indeed "substantial" as had been indicated earlier in the proxy statement. Each holder of TSC Series 1 Preferred, which closed on November 7 at $12.00, would be receiving National securities worth $15.23 at that closing, while each holder of TSC Common, which closed at $13.25 on that

---

16. The Boards of Directors of National and TSC have approved the Agreement and believe that the transactions contemplated thereby are in the best interests of the shareholders of both corporations, who will benefit through the diversified activities of the surviving corporation. In reaching their decision the Boards of Directors of each corporation considered not only recent market prices of the securities of the two corporations, but also the preferred dividend to be paid to the TSC stockholders, the businesses and financial conditions of both corporations and various other factors.

At the request of TSC, the investment banking firm of Hornblower & Weeks-Hemphill, Noyes rendered a favorable opinion as to the fairness to the stockholders of TSC of the terms, set forth below, for the exchange of the shares of TSC for securities of National. The TSC Board considered this opinion in approving the sale. In such opinion, said firm considered, among other things, the current market prices of the securities of both corporations, the high redemption price of the National Series B Preferred Stock, the dividend and debt service requirements of both corporations, the substantial premium over current market values represented by the securities being offered to TSC stockholders, and the increased dividend income.

17. The November 7, 1969 closing prices were as follows:

| | |
|---|---|
| National Series B Preferred Stock | $16⅝ |
| National Warrants | $ 5¼ |
| TSC Common Stock | $13¼ |
| TSC Series 1 Preferred Stock | $12 |

day, would be receiving National securities worth $16.19.[18]

The shareholders were not told that in a subsequent communication the Hornblower firm had predicted that when issued, the National Warrants involved in the exchange would have declined from the November 7 closing price of $5.25 to a market value of $3.50. Such a disclosure would have reduced the apparent premium being offered TSC shareholders by fifty-four percent for holders of Series 1 Preferred and eighty-nine percent for holders of TSC Common.[19] Both corporations were aware of the likelihood of such a decline. The topic was discussed at the TSC board meeting which considered the proposed liquidation and sale, and the subsequent Hornblower opinion letter was specifically requested by National.

In simple terms, TSC and National had received some good news and some bad news from the Hornblower firm. They chose to publish the good news and omit the bad news. Thus, TSC shareholders who relied on the joint proxy statement were led to believe that Hornblower considered the current market values disclosed in the proxy to be accurate indicators of the "profit" to be generated by the exchange being proposed. This wasn't true. The materiality of the omission is obvious.

 Additionally, stockholders of TSC should have been informed of substantial purchases of National Common Stock by National and by Madison Fund, Inc. during 1968–69,[20] and that between the Schmidt acquisition by National on January 31, 1969 and the proxy solicitation on November 12, 1969 these two corporations accounted for 8.5% of all reported transactions in National Common Stock. It is not disputed that Mr. Edward Merkel, president of Madison Fund, was a paid consultant of National receiving $12,000 per year[21] for "being available" to National for at least one day per month,[22] nor is it disputed that the chair-

18. Each holder of TSC Preferred would receive .6 National B Preferred (.6 × $16⅝ = $9.98) plus one National Warrant ($5.25) or a total value of $15.23 for his $12 TSC Preferred share; each holder of TSC Common would receive .5 National B Preferred (.5 × $16⅝ = $8.31) plus 1.5 National Warrants (1.5 × $5.25 = $7.88) or a total value of $16.19 for each of his $13.25 TSC Common shares. Thus, the apparent per share premiums would be $3.23 and $2.94, respectively.

19. The holders of TSC Preferred, whose apparant premium had been $3.23 per share, would have to deduct the difference between the market value disclosed and the Hornblower adjusted value of National Warrants, or $5.25–$3.50 = $1.75. Their premium would therefore be reduced by 54% from $3.23 to $1.48 per share. The reduction for holders of TSC Common would be greater since their exchange involved 1.5 Warrants per share. Thus, from an apparent premium of $2.94, each holder would have to deduct ($5.25–$3.50) × 1.5 = $2.63. This equals a total premium diminution of 89% from $2.94 to $.31 per share of TSC Common.

20. During this period, National and Madison acquired approximately 260,000 shares of National Common Stock. In addition Madison acquired $2 million in National debentures convertible to Common. There is no mention whatever of the Madison purchases in the joint proxy statement, and while the National acquisition of approximately 80,000 shares of National Common is reflected in a table entitled "Statements of Consolidated Stockholder's Equity," which appears on page 63 of the proxy statement, and note J to that table, which appears at the bottom of page 69, this disclosure is insufficient under the "equal emphasis" rationale of this court's decision in Mills v. Electric Autolite Company, 403 F.2d 429 (7th Cir. 1968) rev'd on other grounds, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1969). Just as the board in Mills "was not free to state its recommendation and opinion favoring the merger without giving similar emphasis to the relationship between the directors and the other party to the bargain," 403 F.2d at 434, neither were National and TSC free to emphasize and highlight the importance of current market values of National securities at the beginning of the proxy statement and then bury a partial disclosure of material information affecting those values in a barrage of statistics and footnotes fifty pages later.

21. Mr. Merkel's original agreement with National provided a salary of $2,500 per year. On October 1, 1968 this figure was raised to $12,000. Two days later, on October 3, 1968, Madison acquired $2 million in National debentures convertible into its Common Stock.

22. On July 19, 1972, Mr. Merkel consented to the entry of an order by the SEC finding in part that he had caused Madison to purchase 182,500 shares of National Common and National convertible bonds in the amount of $2

man of National's board of directors, Bernard Barnett, was a director of Madison.

The trial judge found that these facts, coupled with the peculiar timing of the National and Madison acquisitions,[23] showed "the opportunity for coordination." 361 F.Supp. at 116. The judge held, however, that while "the inference that might be drawn from [this] evidence might support a finding of coordination, the Court is not free to draw such inferences." *Id.* But the purpose of 14a–9 is to allow the stockholders to draw such inferences as they see fit before their final decision on proxy questions. While we agree that collusion is not conclusively established by the omitted facts, it is certainly suggested. Stockholders contemplating an offer involving preferred shares convertible to common stock and warrants for the purchase of common stock must be informed of circumstances which tend to indicate that the current selling price of the common stock involved may be affected by apparent market manipulations. It was

for the shareholders to determine whether the market price of the common shares was relevant to their evaluation of the convertible preferred shares and warrants, or whether the activities of Madison and National actually amounted to manipulation at all. This is the very purpose of disclosure.

We therefore hold that failure to disclose the unfavorable opinion letter from Hornblower and the facts surrounding the National-Madison acquisitions also violated Rule 14a–9 as a matter of law.

### C

Northway's final claim under 14a–9 is that the proxy statement was materially misleading in its unqualified assertion that the TSC board of directors had approved the proposed liquidation and sale. First, Northway asserts that the proposal was never legally approved under the applicable Delaware law. The district judge found that § 144 of the Delaware Corporation Law[24] covered the approval procedure in this case and that under that section, the approval vote was legal-

---

million without disclosing that he was a salaried employee of National. In re Merkel, SEC Investment Co. Release No. 7280 (July 19, 1972). The consent was given solely for the purposes of settlement, according to the order.

23. National and Madison never made purchases during the same week; in individual weeks, the percentages of total reported trading by them ran as high as 66% for Madison and 35% for National. Madison and National purchases were consistently substantial during periods relevant to previous National take-over bids directed to other corporations and their stockholders, and when National Common showed definite signs of weakening on the market.

24. Del.Code Ann. tit. 8, § 144 (1969).

§ 144. *Interested directors: quorum.—* (a) No contract or transaction between a corporation and 1 or more of its directors or officers, or between a corporation and any other corporation, partnership, association, or other organization in which 1 or more of its directors or officers, are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the

meeting of the board or committee thereof which authorizes the contract or transaction, or solely because his or their votes are counted for such purpose, if;

(1) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors or the committee, and the board or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or

(2) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the shareholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the shareholders; or

(3) The contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified, by the board of directors, a committee [thereof], or the shareholders.

(b) Common or interested directors may be counted in determining the presence of a quorum at a meeting of the board of directors or of a committee which authorizes the contract or transaction.

ly sufficient.[25] In view of our disposition of Northway's other claims, and in view of the fact that this issue has not been resolved by the courts of Delaware, we decline to reach the question. We do note, however, that Professor Folk, whose article[26] was relied upon by the district judge, has stated that he never intended his article to indicate that the procedure followed by the TSC board would be legally sufficient to adopt a resolution of dissolution and liquidation. It is Professor Folk's opinion that the TSC board never legally approved the proposed resolution under Delaware law.[27]

A second facet of Northway's final claim remains. The resolution of dissolution and liquidation was presented to a meeting of the TSC board on October 16, 1969. Attending that meeting were eight of the ten directors who comprised the board at that time. Charles F. Simonelli and Hyman Ullner, both National nominees, were absent from the meeting. The proposal was summarized for the board by Mr. Allan Solomon, another National nominee. A period of discussion ensued and a vote was called. The three National nominees attending the meeting announced that though they felt this was a good proposal, they had been advised by their attorneys not to vote on the matter.[28] Orville E. Peterson, who had just negotiated the sale of his TSC stock to National for cash and notes payable over five years, also abstained in view of this recent sale. The four remaining directors voted in favor of the proposal to liquidate and to sell to National.

Northway points out that the resolution of dissolution and liquidation was thus passed upon by a minority of the entire board and that the resolution never received a simple majority of those present and eligible to vote at the October 16th meeting. They contend that

---

**25.** Under normal circumstances, a proposal requiring dissolution would require a majority of the whole board, or in this case, six votes:

§ 275. *Dissolution; procedure.*—(a) If it should be deemed advisable in the judgment of the board of directors of any corporation that it should be dissolved, the board, after the adoption of a resolution to that effect by a majority of the whole board at any meeting called for that purpose, shall cause notice to be mailed to each stockholder entitled to vote thereon of the adoption of the resolution and of a meeting of stockholders to take action upon the resolution.

\* \* \* \* \* \*

Del.Code Ann. tit. 8, § 275 (1969).

**26.** Folk, Corporation Law Developments, 56 Va.L.Rev. 755, 782 (1970).

**27.** Professor Folk was contacted by letter by Mr. Arnold Shure, attorney for Northway. In his reply letter, dated July 19, 1973 and filed with the district court on July 24, 1973 as Exhibit A to Plaintiff's Reply to Corporate Defendants' Objections Concerning Plaintiff's Motion Under 28 U.S.C. § 1292(b), Professor Folk states:

The question on which you seek clarification of my views is whether the affirmative votes of disinterested directors, comprising less than a quorum of the board of directors, will be sufficient to approve a resolution calling for the dissolution of a corporation when Section 275(a) requires action "by a majority of the whole board." In my view, a resolution of dissolution adopted by less than a majority of the board of directors (even though those directors have no "interest" in the dissolution) is not effective action by the board for purposes of complying with the specific mandate of Section 275(a). I do not consider that the statement in my article implies or suggests that such a resolution has been effectively approved, and, indeed, that the implications of my statement are the other way. It is this issue which I now analyse.

. . . . .

My position is that Section 144 of the Delaware Corporation Law does not state rules as to formal effectiveness of action by a board of directors. It states rules as to when formally effective action may or may not be challenged because of a conflict of interests. To be specific, Section 275 declares the formalities necessary to adopt an effective resolution of the board of directors calling for dissolution of a corporation. That formality is approval "by a majority of the whole board." Section 144(a)(1) does not undercut this statutory requirement for effective action by the board of directors. The role of Section 144, in my judgment is to predict and determine when formally effective action under Section 275(a) will be held valid or voidable, under Section 144, as the case may be, because of an alleged conflict of interests.

**28.** Messrs. Segell, Solomon and Yarmuth.

these facts are so unusual that even if Delaware law allows such a procedure, the stockholders would want to know that the proposal received only four affirmative votes and that those interested directors who could have voted were cautioned against doing so by their legal advisors.

■ While we agree that the passage of an extraordinary resolution by four affirmative votes out of a total of ten board members is highly unusual, we do not think that this, standing alone, is the type of information which is clearly relevant to a shareholder's decision to approve the underlying proposal. We further believe that reasonable minds could differ on the question of whether or not a reasonable shareholder might consider this information important to his decision. Such information is not related to the substance of the liquidation and sale proposal as is information which reflects on the market value of securities involved, nor is it as suggestive of self-dealing as is information related to possible control relationships between the participating corporations. Without other facts, this information may only indicate that those who favored the transaction but felt a possible conflict did not wish to taint the vote of the disinterested board members who also approved of the proposal. The materiality of this omission is not properly determined on motion for summary judgment.

### III

The Schmidt defendants are charged with violations of § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C.

§ 78j(b), and Rule 10b–5[29] thereunder, and with aiding and abetting the corporate defendants in the various fraudulent activities charged against them in the plaintiff's complaint.[30]

Count III of the complaint sets out the following wrongful acts upon which recovery from the Schmidt defendants is sought:

(a) Said defendants failed to have included in said agreement, and failed to make any effort or attempt to have included therein, any terms or provisions to insure that National would not acquire or attempt to acquire complete ownership of TSC, except at a price and on terms at least equal to and not less favorable than those accorded by National to the Schmidt defendants.

(b) Said defendants failed to have included in said agreement, and failed to make any effort or attempt to have included therein, any terms or provisions to insure that National would not utilize its control of TSC to its own exclusive advantage and to the detriment of TSC and its independent stockholders.

(c) Said defendants transferred actual or working control of TSC to National, and aided and abetted National in acquiring complete ownership of TSC for newly issued equity securities at a fraudulently low and grossly inadequate consideration and at a price and on terms which were substantially less favorable to TSC and the independent stockholders of TSC than those accorded the Schmidt defendants, and

---

**29.** Rule 10b–5, 17 C.F.R. § 240.10b–5, provides:

It shall be unlawful for any person directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
(1) to employ any device, scheme, or artifice to defraud,
(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made not misleading, or

(3) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

**30.** In addition to the proxy violations discussed above, the corporate defendants were charged with pursuing various fraudulent activities aimed at securing an unfair advantage over the TSC shareholders in violation of Rule 10b–5. All of the alleged fraudulent activities took place after the acquisition of the Schmidt interests by National.

which were otherwise grossly unfair to TSC and the independent stockholders of TSC.

(d) Said defendants transferred their shares of TSC to National in a manner which resulted in their receiving a substantially higher price for their shares than was received by the independent stockholders of TSC, which higher price was payable in cash and notes of National which were senior to the substantially less valuable equity securities of National received by the independent stockholders of TSC and which would be payable to said Schmidt defendants wholly or partly out of the earnings and cash flow of TSC.

(e) Said defendants in disposing of and transferring, actual or working control of TSC to National, wrongfully used and employed said actual or working control to their own exclusive benefit and to the detriment and injury of TSC and its independent stockholders, and failed to exercise due and proper care and diligence to protect the interests of TSC and its independent stockholders.

The trial court properly found that the first two specific alleged violations, (a) and (b), fail to state a claim. Although it is clear that a stockholder who holds a controlling interest in a corporation owes a fiduciary duty to protect the corporate interests and to avoid exalting his own interests above those of the corporation or its other shareholders,[31] that recognized obligation is not without reasonable limitations. No court has yet intimated that the holder of a controlling interest must indemnify all other shareholders from adverse market trends in order to fulfill his obligations to those shareholders in transferring control.[32] Nor has any court ever required the inclusion in such a bargain of a covenant by the acquiring

party not to do what the law already prohibits. The mandatory inclusion of either such covenant would have far reaching and unfortunate effects. The first requirement would make the transfer of controlling interests almost impossible since no prudent investor, conglomerate or otherwise, would presume to guarantee any specific price for future acquisitions of a fluctuating security. The second requirement would do more to demean the fiduciary concepts here involved than to preserve them since any such provision, if judicially imposed, would merely become boilerplate in all prudent stock purchase agreements. These two specific claims were properly stricken.

Specific allegation (c) charges the Schmidt defendants with aiding and abetting the corporate defendants in the fraudulent acquisition of the remaining securities of TSC. Since there is nothing in the record to indicate that any of the Schmidt defendants had any contact with either National or TSC subsequent to the transfer of the Schmidt interests on or about February 7, 1969, such a charge must find support in the limited contacts between National representatives and Charles E. Schmidt, Sr. in the brief period between January 6, 1969, when Mr. Schmidt first became aware of National's interest, and the execution of the stock purchase agreement on January 30, 1969.

An examination of the relevant portions of the record reveals no suggestion that Schmidt in any way facilitated the fraudulent take-over by National other than by selling the Schmidt interests to National. This, standing alone, does not constitute aiding and abetting. There is no indication that any one of the Schmidt defendants was consciously involved in a scheme to procure a premium for control, or that any of these defendants were on constructive notice that National intended to commit a

---

**31.** See e. g., Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), Southern Pacific Co. v. Bogert, 250 U.S. 483, 39 S.Ct. 533, 63 L.Ed. 1099 (1919), Lebold v. Inland S.S. Co., 82 F.2d 351 (7th Cir. 1936).

**32.** Percodani v. Rikes-Maxson Corp., 50 F.R.D. 473, 475, 478 (S.D.N.Y.1970), on which Northway relies, does not suggest such a *requirement.*

fraud in any future transaction. The evidence is all the other way. An investigation of National Industries and its executive personnel initiated by Schmidt did not disclose any prior fraudulent activities by National, and the Schmidts were assured by reliable sources that the National people were top flight in every respect. Under these circumstances there is simply no connection between the Schmidt defendants and National's later activities, and there is certainly no hint that the Schmidts in any way anticipated, or could have anticipated, the use of a fraudulent proxy statement.

As the trial court pointed out, each of the cases relied upon by Northway is distinguishable from the present situation. In each of those cases there was an involvement contemporaneous with and essential to the fraud. In Brennan v. Midwestern United Life Insurance Company, 417 F.2d 147 (7th Cir. 1969), cert. denied, 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970), Midwestern had failed to report complaints they received about the activities of a stockbroker to the Indiana Securities Commission when circumstances indicated a clear possibility of misuse of Midwestern's Securities by that broker. It was specifically found that

> Midwestern's actions amounted to a tacit agreement with [the broker] to prevent complaints from reaching the Commission, thus facilitating the fraud and allowing [the] scheme to continue to Midwestern's benefit. *Id.* at 155.

The allegations reviewed in Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, 410 F.2d 135 (7th Cir. 1969), cert. denied, 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969) disclosed a similar situation:

> Here it is alleged that defendant knew or should have known of the bankrupt's scheme to convert securities investment funds and nevertheless enabled the bankrupt to engage in large-scale speculations with its customers' funds through defendant's office. . . . [W]e are persuaded that Count II sufficiently alleges that defendant benefited by a course of business which operated as a fraud upon the bankrupt's customers to entitle those customers, through the trustee in bankruptcy, to recover the net transfers of the funds so converted. *Id.* at 144.

Our opinion in Carroll v. First National Bank of Lincolnwood, 413 F.2d 353 (7th Cir. 1969), cert. denied, 396 U.S. 1003, 90 S.Ct. 552, 24 L.Ed.2d 494 (1970) merely held that a complaint which charged that the defendant bank was a "main participant in a scheme to defraud by active concealment of that scheme" stated a claim on the theory of aiding and abetting. Finally, in SEC v. First Securities of Chicago, 463 F.2d 981 (7th Cir. 1972), cert. denied, 409 U.S. 880, 93 S.Ct. 85, 34 L.Ed.2d 134 (1972), we held that First Securities had aided and abetted its president in defrauding various of its regular clients by holding him out as a successful investment counsellor and then wilfully allowing him to enforce a rule prohibiting anyone from opening his mail—a rule which prevented the discovery of his fraudulent scheme during its operation. Clearly the involvement disclosed in these cases far surpasses any involvement of the Schmidt defendants in the take-over, if it could be said there was any involvement.

The trial court correctly found that the exhibits and evidence before it on defendants' motion for summary judgment raised no genuine issue as to any fact which would establish liability under the theory of aiding and abetting.

Specific claim (d) was not separately considered by the trial court in its opinion, but was merged with the discussion of claims (c) and (e). To the extent that this claim relies on the higher compensation received by the Schmidts, the disposition of claim (a) controls here. To the extent that it charges a conscious plan to have the remaining TSC shareholders indirectly bear the burden of an exorbitant compensation for the Schmidt interests, cf. Dasho v. Susquehanna, 380 F.2d 262 (7th Cir. 1967), the claim finds no support in the record. There is no evidence of any conscious plan, and the

expert witnesses of both plaintiffs and defendants concluded that the Schmidts received no more than market value for their shares.[33]

Specific claim (e), plaintiff's last claim, adds the charge that the Schmidts failed to fulfill their fiduciary obligations to the minority shareholders by making an insufficient investigation of National prior to transferring control.[34] Again, the record fails to support the claim. It is undisputed that the Schmidt transfer was finalized only after Schmidt, Sr. had 1) analyzed a National prospectus for a recent debenture offering which supplied considerable information about National management, disclosed that National was associated with several highly reputable investment banking firms, and showed that National was able to market debentures at a very favorable interest rate; 2) recognized the names of two highly respected persons on the National board of directors, persons Schmidt felt "would be in a position to do things for and with" TSC; 3) reviewed, with the help of Richard Schaefer, then an executive officer and member of the board of TSC, various financial reports regarding National Industries; and 4) met with top officers of First National City Bank of New York who indicated their bank was well acquainted with National Industries, that the National people were top flight people who always kept their commitments, and that Stanley Yarmuth, president, director, and chief executive officer of National was very highly regarded by First National City Bank.

Northway contends that having discovered no unfavorable information at this point, the Schmidts were obliged to keep digging. There is no suggestion, however, as to what further steps would have been appropriate, other than a rather pointless suggestion that Schmidt should have inquired whether National intended at that point to commit a fraudulent take-over. But the duty to investigate those to whom one transfers a controlling interest in a corporation, like other fiduciary duties, does not exist in a vacuum. It takes its meaning in part from the circumstances in which it is confronted. Thus, in Insuranshares Corp. v. Northern Fiscal Corp., 35 F.Supp. 22 (E.D.Pa.1940), the court emphasized the relation between the scope of the duty of investigation and the setting in which the transfer is made:

> Those who control a corporation . . . owe some duty to the corporation in respect of the transfer of the control to outsiders. [S]uch persons may not be wholly oblivious of the interests of everyone but themselves . . . . Without attempting any general definition, and stating the duty in minimum terms . . . it may be said that the owners of control are under a duty not to transfer it to outsiders if the circumstances surrounding the proposed transfer are such as to awaken suspicion and put a prudent man on his guard—unless a reasonably adequate investigation discloses such facts as would convince a reasonable person that no fraud is intended or likely to result. Thus, whatever the primary duty may be, circumstances may be sufficient to call into being the duty of active vigilance and inquiry. *Id.* at 25.

In *Insuranshares*, the court found numerous factors which "were sufficient to

---

**33.** In March of 1969, at National's request, the firm of Bear, Stearns & Co. evaluated the consideration paid to the Schmidts at $21,-053,407.18; the closing prices of the TSC Common and Preferred Stock on the New York Stock Exchange on the date on which the stock purchase agreement was signed were $27⅝ for TSC Common and $21⅛ for TSC Preferred. These prices produce a total market value of $21,296,224.63 for the Schmidt interests on that day.

Professor Erwin E. Nemmers, Northway's expert witness, testified that the fair market values of the Schmidt interests, on a per share basis, ranged from $29.80 to $36.40 for the common shares and from $22.55 to $27.30 for the preferred shares. By any analysis, the per share consideration received by the Schmidts falls well within these ranges.

**34.** The control issue itself remains a factual question. Our consideration of this claim assumes that control was in fact transferred by the Schmidts.

indicate to any reasonable man in his position that the [purchasing parties] were acquiring the control of the corporation by improper means and for an improper purpose." *Id.*

Although we are unable to read *Insuranshares* as holding that absent suspicious circumstances there is no duty to investigate prior to the transfer of a controlling interest, we agree that the duty in every case is tied to the nature of the peculiar circumstances which exist at the time of such a transfer. We find that the evidence before the trial court in this case presented no facts which would indicate that the Schmidt defendants were under a duty to investigate further than they did. The granting of the Schmidt defendants' motion for summary judgment was therefore proper as to claim (e).

The order of the district court granting summary judgment in favor of the Schmidt defendants is affirmed. The denial of summary judgment in favor of plaintiff Northway and against defendants National Industries, Inc. and TSC, Inc. on the issue of liability is reversed, and the cause is remanded for further proceedings consistent with this opinion.